UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------X
RICHARD MESSIER, et al.            :
                                   :
        Plaintiffs,                :
                                   :
             v.                    :    No. 3:94-CV-1706 (EBB)
                                   :
SOUTHBURY TRAINING SCHOOL, et al.  :
                                   :
        Defendants.                :
-----------------------------------X
```

MEMORANDUM OF DECISION AND ORDER

This class action challenging the defendants' administration of Southbury Training School ("STS"), an institution for the mentally disabled in the State of Connecticut, was brought in 1994 by residents of STS and by three advocacy organizations. The plaintiffs, who seek solely injunctive relief, allege constitutional and statutory violations relating to the conditions, services and programs at STS. On January 25, 1999, a 123-day bench trial was commenced before the court. The case is now ready for decision.

BACKGROUND

On July 8, 1996, pursuant to Federal Rule of Civil Procedure 23(b), the court certified the plaintiff class to include all current STS residents, persons who might be placed at STS in the future, and persons who were transferred from STS but remain under the control of the STS Director. As of the date of the trial in

this case, the plaintiff class included approximately 700 residents of STS.[1]  The defendants in this case are STS itself, the Director of STS, and the Commissioner of the Connecticut Department of Mental Retardation ("DMR").[2]

First, the plaintiffs claim that STS and DMR violated the class members' substantive due process rights by (1) failing to provide adequate shelter, clothing, nutrition, and medical care; (2) failing to provide adequate habilitation and training services to class members such that class members could retain self-care skills and remain free from the unnecessary use of restraints; (3) failing to provide safe conditions to class members and to protect them from bodily harm; and (4) failing to exercise professional judgment in making decisions about whether or not to place class members in the community rather than at STS.  (Third Am. Compl. ¶¶

---

[1]Pursuant to a consent decree, there have been no new admissions to STS since the 1980s, and as a result, the majority of STS residents are over 45 years in age.  Most class members have lived at the institution since being placed there as children.  In 1997, more than 600 residents had lived at STS for more than 30 years and 188 residents were older than 61.  As of 1997, 158 residents were labeled as severely retarded and an additional 440 were labeled as profoundly retarded.  The remaining residents have moderate or mild retardation, or, in a couple of cases, no retardation at all.

[2]The Commissioner of the Connecticut Department of Social Services ("DSS") and the Commissioner of the Connecticut Department of Public Health ("DPH") were originally named as defendants in this case.  The court granted these two defendants' motions for summary judgment and they were accordingly dismissed from the case.  Messier v. Southbury Training School, No. 94-CV-1706, 1999 WL 20910 at *5 nn.5, 6 (D. Conn. Jan. 5, 1999).

48-64, 69-75, 83, 86(a)-(I).)

Second, the plaintiffs claim that the defendants violated Title II of the Americans with Disabilities Act of 1990 ("ADA" or "Title II"), 42 U.S.C. § 12132 (1997), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 (1997), by failing to place class members in community-based residential settings. The plaintiffs claim that the defendants violated these statutes in two different ways. The plaintiffs first claim that STS and DMR violated the "integration mandates" of the ADA and Section 504 by failing to make sufficient efforts to place class members into integrated settings in the community. (Id. ¶ 87.) The plaintiffs' second claim under the ADA and Section 504 is that the defendants discriminated on the basis of the severity of class members' disabilities by failing to consider community placement for certain profoundly and severely retarded STS residents. (Id. ¶¶ 81, 83, 87.)

Third, the plaintiffs seek relief pursuant to 42 U.S.C. § 1983 for violations of Title XIX of the Social Security Act ("Title XIX"), codified at 42 U.S.C. § 1396a et seq., which governs the certification that is required by an intermediate care facility for the mentally retarded ("ICF/MR") in order to receive certain federal funding. The plaintiffs claim that the defendant Commissioner of DMR violated Title XIX by failing to provide some class members with "active treatment" as required by § 42 U.S.C. §

1396d(d), as well as by failing to provide medical and other services consistent with that statute. (Third Am. Compl. ¶ 88.)

Many of the instances of inadequate medical care, security and habilitation programming at STS have been the subject of a related case, United States v. Connecticut, No. 3:86-cv-252 (D. Conn. 1986), which was, until recently, pending before this court. The United States v. Connecticut litigation was initiated in 1986, when the United States Department of Justice brought suit against the State of Connecticut seeking to remedy allegedly unconstitutional conditions at STS. Later in 1986, a consent decree was negotiated by the parties and was approved by the court. The court approved additional consent decrees in 1990 and 1991. In 1993, attorneys from the Department of Justice, along with a team of experts, investigated conditions at STS and concluded that the defendants had failed to comply with the consent decrees. See United States v. Connecticut, 931 F. Supp. 974, 975-76 (D. Conn. 1996).

After conducting a hearing, the court found by clear and convincing evidence that defendants had not complied with the terms of the consent decree and held them in contempt. Id. The contempt hearing revealed numerous deficiencies in the conditions at STS and the services and programs provided to its residents. The court found that "STS's systemic flaws [had] caused many residents to suffer grave harm, and, in several instances, death." Id. at 983-84. The court found that STS provided inadequate medical care to

its residents.  <u>Id.</u> at 980.  The court found that STS had failed to implement the habilitation programs needed to train residents to avoid injury.  <u>Id.</u> at 977-78.  The court found that STS administered behavior modifying medication in cases where the institution should have provided habilitation.  <u>Id.</u> at 979-80.  The court found that physical therapy services as STS were so inadequate as to have caused "several residents who, only a few years earlier, were ambulatory, to be permanently bed-ridden."  <u>Id.</u> at 983.

In <u>United States v. Connecticut</u>, as the plaintiffs here were aware, the court appointed a Special Master to review many aspects of care and treatment at STS and to work with the parties in implementing changes to STS's operations.  <u>Id.</u> at 985.  Following his appointment in 1997, Special Master David Ferleger and the parties created a comprehensive Remedial Plan that specified certain objectives upon which the parties had agreed.  Remedial Plan, <u>U.S. v. Conn.</u> (April 1, 1998).[3]  The Remedial Plan set forth 95 Court Requirements ("CR"), thus establishing standards that the institution would be required to meet in order to purge itself of contempt.  These Court Requirements covered most areas of STS's operations including staffing, quality assessment procedures, medical treatment, administration of medication, habilitation

_____

[3]In citing documents filed in <u>United States v. Connecticut</u>, the court will use the abbreviation "<u>U.S. v. Conn</u>" followed by the date on which the document was docketed.

programming, and case management.

In a process of evaluation lasting almost a decade, the Special Master, with the assistance of experts commissioned by him and the parties, measured improvements at STS against the standards set forth in the Court Requirements. Periodically, when the Special Master concluded that the defendants had demonstrated compliance with a particular Court Requirement, he recommended that the court release STS from oversight for that Court Requirement. Finally, in 2006, after the Special Master found STS to be in compliance with all remaining requirements of the Remedial Plan, the court released STS from judicial oversight and purged the defendants of contempt. <u>See</u> Order Purging Defendants of Contempt and Ending Active Judicial Oversight, <u>U.S. v. Conn.</u>, (Mar. 24, 2006).

<u>DISCUSSION AND FINDINGS</u>

I.  <u>The Due Process Requirements for Programs and Services at State-Run Institutions</u>

Residents of state-operated institutions for the mentally retarded "have a constitutional right to adequate food, shelter, clothing and medical care." <u>Society for Good Will to Retarded Children, Inc. v. Cuomo</u>, 737 F.2d 1239, 1243 (2d Cir. 1984) (citing <u>Youngberg v. Romeo</u>, 457 U.S. 307, 316 (1982), and <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976)). Residents also have a constitutionally protected interest in safe conditions and in freedom from bodily restraint except to the extent that restraint

6

must be used to assure safety. <u>Youngberg</u>, 457 U.S. at 315-16, 323; <u>see also</u> <u>Society for Good Will</u>, 737 F.2d at 1245. Due process also requires that an institution provide its residents with a minimal level of training, or "habilitation."[4] <u>Youngberg</u> 457 U.S. at 324.

These constitutional requirements are satisfied when state actors have exercised "professional judgment" in determining what services and care should be provided to residents of state-run institutions. <u>Youngberg</u>, 457 U.S. at 321-22. This standard, which is highly deferential to the decisions of the state's professionals, is intended to strike a balance between the "liberty interest of the individual" and the "legitimate interests of the State, including the fiscal and administrative burdens additional procedures would entail." <u>Id.</u> at 321 (citing <u>Parham v. J.R.</u>, 442 U.S. 584, 599-600 (1979)). Under this standard, a "decision, if made by a professional, is presumptively valid." <u>Id.</u> at 323.

Plaintiffs may demonstrate a violation of the requirement that the state exercise professional judgment in at least two ways. Plaintiffs will prevail, for example, when state actors "simply failed to exercise any professional judgment." <u>See</u>, <u>e.g.</u>, <u>Valentine v. Strange</u>, 597 F. Supp. 1316, 1318 (D.C. Va. 1984)

---

[4]The court uses the terms "habilitation" and "training" more or less synonymously, as do the parties. <u>See</u> <u>Youngberg</u>, 457 U.S. at 309 n.1 (explaining that the "principal focus of habilitation is upon training and development of needed skills") (quoting Brief for American Psychiatric Association as Amicus Curiae at 4, n.1).

(declining to dismiss complaint by patient who set fire to herself after hospital officials took no action to confiscate her cigarettes and lighter despite the fact that she had unsuccessfully attempted to burn herself earlier in the day). Deference under Youngberg is not owed to decisions made by individuals who are not qualified professionals. See, e.g., Cameron v. Tomes, 783 F. Supp. 1511, 1520-21 (D. Mass. 1992) (finding due process violation where facility's administrator ignored recommendation of professionals and ordered a patient to be transported in shackles). For the purposes of determining whether such judgment has been exercised, a professional is defined as "a person competent, whether by education, training or experience, to make the particular decision at issue." Youngberg, 457 U.S. at 323 n.30.

Plaintiffs may also prevail where a decision made by a qualified professional was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323; see also Terrance v. Northville Regional Psychiatric Hosp., 286 F.3d 834, 850 (6th Cir. 2002). Plaintiffs cannot establish a violation of constitutional norms merely by showing that the state did not "follow[] . . . the optimal course of treatment." Society for Good Will, 737 F.2d at 1248. A court cannot find a constitutional violation simply because experts testify that they would have made a different

treatment choice.  P.C. v. McLaughlin, 913 F.2d 1033, 1043 (2d Cir. 1990) ("The requirement that professional judgment be exercised is not an invitation to a court reviewing it to ascertain whether in fact the best course of action was taken."); Griffith v. Ledbetter, 711 F. Supp. 1108, 1110 (N.D. Ga. 1989).  Generally, testimony of the plaintiffs' experts will be relevant to show that the decisions made substantially departed from professional standards.  Society for Good Will, 737 F.2d at 1248 ("Expert testimony is . . . relevant not because of the expert's own opinions-which are likely to diverge widely-but because that testimony may shed light on what constitutes minimally acceptable standards across the profession."); see also Youngberg, 457 at 323 n.31.

II.  Collateral Estoppel

In their Post-Trial Brief, the plaintiffs argue that the defendants are collaterally estopped from claiming that the conditions and services at STS satisfy the constitutional requirements established in Youngberg.  (Pl.'s Post-Trial Br. at 148.)  The plaintiffs argue that the defendants "resolved such issues by entering into a consent decree in United States v. Connecticut" and are therefore barred from relitigating the issues covered in the consent decree.[5]  (Id.)

_____

[5]The plaintiffs also raised this argument in a Motion for Partial Summary Judgment filed on September 3, 1999 (Doc. No. 746).  The court denied the motion on the ground that it was untimely, but allowed the plaintiffs to raise the argument again in their post-trial brief.  (Doc. No. 780)

"Under the doctrine of offensive collateral estoppel, a plaintiff may preclude a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff." Faulkner v. Nat'l Geographic Enters. Inc., 409 F.3d 26, 37 (2d Cir. 2005) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329 (1979)). The defendants will be estopped from rearguing the constitutionality of conditions and services at STS only if all four conditions of the following test are satisfied:

> (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quotations omitted); see also Faulkner, 409 F.3d at 37 (quoting Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir. 1986)).

The flaw in the plaintiffs' collateral estoppel argument is that the constitutional claims they raise in this case were not "actually litigated and decided" in United States v. Connecticut. The consent decree was a settlement, not a judgment on the merits. Even insofar as some of the constitutional issues raised by the plaintiffs in this case are identical to some of the claims raised by the Department of Justice in the earlier case, the court did not, in approving the consent decree, decide those issues.

"[S]ettlements ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear . . .

that the parties intend their agreement to have such an effect."
<u>Arizona v. California</u>, 530 U.S. 392, 414 (2000). In some
instances, a consent judgment "may involve a determination of
questions of fact and law by the court." <u>United States v. Int'l
Bldg. Co.</u>, 345 U.S. 502, 505-6 (1953). However, "unless a showing
is made that that was the case, the judgment has no greater
dignity, so far as collateral estoppel is concerned, than any
judgment entered only as a compromise of the parties." <u>Id.</u>; <u>see
also</u> <u>Klingman v. Levinson</u> 831 F.2d 1292, 1296 (7th Cir. 1987) ("If
the parties to a consent decree 'indicated clearly the intention
that the decree to be entered shall not only terminate the
litigation of claims but, also, determine finally certain issues,
then their intention should be effectuated.'") (quoting <u>Kaspar
Wire Works, Inc. v. Leco Eng'g & Mach., Inc.</u>, 575 F.2d 530, 539
(5th Cir. 1978)).

As the defendants point out, the consent decree in <u>United
States v. Connecticut</u> explicitly disclaimed any admission of
liability on the part of state officials and stated that the decree
was "enforceable only by the parties." (<u>See</u> Defs.' Post-Trial Br.
at 27 (quoting Consent Decree, <u>U.S. v. Conn</u> (Dec. 12, 1986).) In
entering into the decree, the parties agreed that state officials
did "not admit any violation of law" and that the Consent Decree
"may not be used as evidence of liability in any other civil
proceeding." Consent Decree at 3, <u>U.S. v. Conn</u> (Dec. 12, 1986).

It is therefore obvious that the parties in <u>United States v.</u> <u>Connecticut</u> did not intend the consent decree to act as a determination of questions of law or fact that would preclude future litigation of those issues in other cases involving other parties.[6]

In their Reply to the Defendants' Post-Trial Brief, the plaintiffs offer an additional collateral estoppel argument. The plaintiffs now argue that the court's contempt findings in <u>United</u> <u>States v. Connecticut</u> bar the defendants from asserting the

---

[6]The cases cited by the plaintiffs in support of their collateral estoppel argument are distinguishable or inapplicable. The court's analysis in <u>United States v. Int'l Bhd. of Teamsters</u>, 931 F.2d 177 (2d Cir. 1991), involved the effect of a consent decree on affiliates of the labor union that had entered into to the decree, which is a very different question from the one presented here. <u>Hutton Constr. Co. v. Int'l Fid.</u>, No. 97-7868, 1998 U.S. App. LEXIS 14968 (2d Cir. April 21, 1998), involved the rule that a consent decree may have issue preclusive effect only where the decree involved a determination of issues of law or fact by the court. No such determination was made by the court in <u>United States v. Connecticut</u>. Similarly, in <u>United States v. Tennessee</u>, No. 98-5108, 1999 U.S. App. LEXIS 9842 (6th Cir. May 14, 1999), the issue of collateral estoppel arose only after the district court made determinations of law and fact. The other case cited by the plaintiffs, <u>Yachts America, Inc. v. United States</u>, 673 F.2d 356 (Ct. Cl. 1982), is factually distinguishable because the issue of collateral estoppel was raised by the defendants, who were not parties to the consent decree at issue, against the plaintiffs, who were attempting to relitigate an issue that had been resolved against them in the consent decree. In that case, because of the "broad language contained in the consent decree precluding further suit," the Court of Claims found that the plaintiffs intended to be bound by the terms of the consent decree even when suing a non-party to the decree." <u>Id.</u> at 362. The defendants in this case indicated no comparable intent to be bound by the <u>United States v. Connecticut</u> Consent Decree.

constitutionality of the conditions and services at STS. (See Pls.' Reply at 75-79.) However, in finding contempt in that case, the court was required only to consider whether the defendants had violated the terms of the Consent Decree. The court did not consider whether the defendants had also violated the constitution.

The plaintiffs are correct in pointing out that <u>United States v. Connecticut</u> arose out of claims of constitutional violations that are similar to the claims in this case. However, "[u]se of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.'" <u>Faulkner</u>, 409 F.3d at 37 (quoting <u>Comm'r v. Sunnen</u>, 333 U.S. 591, 599-600 (1948)). The <u>United States v. Connecticut</u> Consent Decree set out in considerable detail the obligations of the defendants. The consent decree included, for example, an obligation to ensure specific staff-to-resident ratios. <u>See</u> Consent Decree at 8-9, <u>U.S. v. Conn</u> (Dec. 12, 1986).) The terms of the consent decree, therefore, do more than simply restate the defendants' constitutional obligations. A court could find that the defendants in <u>United States v. Connecticut</u> had violated the terms of the Consent Decree even though they had not violated the constitution. The legal and factual issues determined by the court in its contempt finding are simply not identical to the issues in this

case.

Therefore, neither the Consent Decree in <u>United States v. Connecticut</u> nor the court's finding of contempt based on violations of the Consent Decree preclude the defendants from arguing in this case that they have fulfilled their obligations under the Constitution.

III. <u>Conditions and Services at STS</u>

In their Post-Trial Brief, the plaintiffs organize their claims into four subject areas. They claim that they have demonstrated at trial 1) that the defendants provided inadequate medical care to class members; 2) that the defendants failed to protect class members from physical harm; 3) that the defendants failed to provide the plaintiffs with adequate habilitation and "active treatment"; and 4) that the defendants failed adequately to consider community placement for class members.

The relief sought by the plaintiffs as a remedy for the defendants' alleged violations relating to the first three of these areas is somewhat limited. The plaintiffs ask that deficiencies in the provision of medical care, protection from harm and habilitation programming be referred to the Special Master's remedial process in <u>United States v. Connecticut</u>. (<u>See</u> Pls.' Post-Trial Br. at 163-65, 167-68, 170-71.) As described above, the Special Master in <u>United States v. Connecticut</u> has already conducted a thorough inquiry into conditions and services at STS

and, along with the Department of Justice, has overseen STS's efforts to remedy deficiencies in these three areas. Much of what the plaintiffs in this case seek from the Special Master's remedial process has already been achieved .

In many instances, there will be no need for the court to determine whether or not the defendants are liable. Insofar as the plaintiffs here have committed themselves to deferring to the Special Master and his remedial process for the resolution of any particular constitutional violation, and the Special Master has directly addressed that issue, the court need not revisit that particular violation. As indicated in the following discussion, the court declines to consider whether the defendants are, in fact, liable for almost all of the alleged violations relating to the provision of medical care, protection of STS residents from harm and provision of adequate habilitation. The court declines to consider whether the defendants are liable under these claims not because the plaintiffs have failed to present sufficient evidence to prove constitutional or statutory violations in these areas but, rather, because these claims are moot since the plaintiffs have achieved everything for which they ask. See Powell v. McCormack, 395 U.S. 486, 495-96 (1969) (noting that a court should find as moot claims in which the relief sought had already been obtained); Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought

can no longer be given or is no longer needed."); County Motors,
Inc. v. General Motors Corp., 278 F.3d 40, 43 (1st Cir. 2002);
Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir.
1996) ("If developments occur during the course of adjudication
that eliminate a plaintiff's personal stake in the outcome of a
suit or prevent a court from being able to grant the requested
relief, the case must be dismissed as moot.") (citations omitted).

A.   Medical Care

The plaintiffs point to evidence of numerous problems with the
medical care that was provided at STS prior to the trial.  (Pls.'
Post-Trial Br. at 3-48; Pls.' Proposed Findings at 69-194.)  The
plaintiffs claim to have established at trial that in many cases,
the medical conditions of STS residents went completely untreated
by STS staff, and that some residents' medical conditions worsened
as a result of the actions of STS doctors, nurses and physicians
assistants.   They claim that physicians assistants were not
properly supervised and that there was insufficient oversight and
review regarding the administration of psychotropic medication.
They claim that medical professionals failed to properly take note
of abnormal laboratory findings and failed to keep legible medical
records.   They also claim that STS failed to adhere to proper
standards regarding the writing and implementation of "do not
resuscitate" orders.

To remedy these alleged instances of deficient medical care,

the plaintiffs ask the court to order the defendants to provide "adequate medical and nursing care to all class members." (Pls.' Post-Trial Br. at 164.) More specifically, the plaintiffs "request that inadequacies in medical care be referred to the remedial mechanism in" United States v. Connecticut for "resolution provided plaintiffs can participate fully in the remedial process." (Id. at 164-65.) The plaintiffs ask the court to refer the following specific issues to the Special Master:

a. The adequacy of nursing services provided to class members.

b. The development of a process to remedy cases of inadequate nursing or medical care.

c. The development of a system of oversight over physicians assistants such that the use of physicians assistants at STS complies "at the very least" with Conn. Gen. Stat. § 20-12d.

d. The development of a system "to ensure that the ultimate oversight of all aspects of medical care rest with the treating physician" and to ensure that "laboratory testing and overall medical condition of the class member will be taken into account when psychotropic medications are administered."

e. The need for a requirement that physicians should participate in the interdisciplinary team ("IDT") process

so that the use of psychotropic medications can be adequately coordinated with other aspects of each class members' overall plan of service.

f. The need for a requirement that class members' records should contain an explanation of why psychotropic medication was prescribed as well as a "medication reduction plan."

g. The need for systematic review of the use of medications at STS, as well as a plan to reduce the use of medications.

h. A requirement that physicians comment on abnormal laboratory findings in a class member's medical record.

i. The establishment of a plan to improve the legibility of class members' medical records.

j. The creation of "memoranda of understanding" with area hospitals addressing, among other issues, the use of DNRs.

k. A requirement that STS adhere to DMR 87-2, which is the regulation relating to the writing and implementation of DNRs.

l. The implementation of nursing care that is "consistent with the ICF/MR regulations."

m. The need to ensure that nurses and other direct care staff receive adequate training so that they are able to

18

understand the health care needs of class members and are able to implement the class members' "care plans[s]." Id. at 165-67.

I.   Medical Care Issues Addressed in United States v. Connecticut

The Remedial Plan implemented by the Special Master in United States v. Connecticut addressed medical care at STS at great length. More than 30 of the 95 Court Requirements in the Remedial Plan directly addressed issues of medical care and the administration of medication. In 2006, after a final expert report commissioned by the Special Master showed sufficient improvements in medical care, he reported that STS was in compliance with all of these Court Requirements, and the court released STS from judicial oversight of all outstanding aspects of the Remedial Plan relating to medical services. Order on Medical Services Compliance, U.S. v. Conn. (March 22, 2006); see also Report to the Court No. 63: Medical Services, U.S. v. Conn. (Feb. 22, 2006). During this process, the Special Master addressed most of the plaintiffs' specific concerns listed above. The Special Master addressed oversight over medical staff, which is the issue raised in the plaintiffs' specific concerns b. and d. from the above list. The Remedial Plan set standards for medical care, nursing care, and specialist medical care (see CR 60, 61, 63-65), set minimum acceptable staffing levels and ratios of supervisory staff to direct care staff (see CR 13-32), and set standards for

communication between care-givers and other staff (see CR 34-40).
The Special Master oversaw the implementation of a "Quality
Assurance" system designed to monitor the care received by STS
residents and to ensure that residents received an adequate level
of care from all medical staff.  See Consultation and Review of
Medical Services: Report to the Special Master, U.S. v. Conn. (Feb.
17, 2006).  Because these aspects of the relief sought by the
plaintiffs have been realized, the court sees no need to determine
liability related to this issue.  The court will not address the
issue of whether the defendants failed to provide for adequate
oversight over medical staff.

Similarly, oversight over the administration of behavior
modifying medication by physicians assistants, the issue raised in
specific concern c. from the above list, was addressed in the
Remedial Plan by CR 66, which required "that only personnel
authorized by state law shall administer medication."  See
Quarterly Report No. 5, U.S. v. Conn. (Dec. 2, 1998) (finding STS
in compliance with CR 66).

The plaintiffs' concern about the quality of nursing services
at STS, expressed in specific concerns a. and l. in the above list,
was addressed by the Remedial Plan in CR 61, which set standards
for nursing care.  In order to give effect to these Court
Requirements, the Special Master and the parties in United States
v. Connecticut developed and implemented plans to correct

deficiencies in the nursing services. <u>See</u> Report to the Court No. 42: Nursing, <u>U.S. v. Conn.</u> (Aug. 23, 2002).

The Remedial Plan also addressed deficiencies in the training of staff at STS, an issue raised by the plaintiffs' specific concern m. from the list above. <u>See</u> CR 33 (requiring the implementation of a training plan); <u>see also</u> Report to the Court No. 19: Staff Training, <u>U.S. v. Conn.</u> (Mar. 27, 2001) (noting the new kinds of staff training added at STS and recommending release from judicial oversight for CR 33).

The administration of behavior-modifying medication at STS, an issue raised by the plaintiffs' specific concerns d., e., f. and g. from the list above, received considerable attention in <u>United States v. Connecticut</u>. <u>See</u>, <u>e.g.</u>, 931 F. Supp. at 979-80 (noting the "[problematic] implications of unqualified (e.g., unlicensed) personnel, in effect, making major decisions regarding pharmacological interventions") (quoting the report of Dr. Volkmar). The Remedial Plan set forth several Court Requirements intended to remedy deficiencies in the manner in which medication was administered. The Remedial Plan established procedures for approving the use of medication (<u>see</u> CR 53) and procedures requiring physicians to systematically review the need for behavior-modifying medication in individual cases (<u>see</u> CR 54). The Remedial Plan subjected "polypharmacy" to additional scrutiny. <u>See</u> CR 55. The Remedial Plan set standards for evaluation of STS

residents who received narcoleptic drugs and required that these individuals be screened for tardive dyskinesia. See CR 56-57. The Remedial Plan required that each resident's primary care physician, as well as all appropriate medical records, be made available to the Program Review Committee, which is responsible for approving IDT decisions about each resident's care and medication. See CR 58-59. In accordance with the Remedial Plan, the Special Master devoted considerable effort to correcting deficiencies in the manner in which behavior-modifying medications were administered at STS. See, e.g., Report to the Court No. 28: Compliance Review: Court Requirement 57, EC 3, U.S. v. Conn. (Sept. 11, 2001); Report to the Court No. 33: Court Requirement 54 and 56, U.S. v. Conn. (Jan. 15, 2002). The Special Master thus addressed all of the plaintiffs' concerns related to the administration of behavior-modifying medication, and the court will not consider liability on this issue.

The United States v. Connecticut litigation also addressed STS' record-keeping procedures. See 931 F. Supp. at 981 (finding that, as of the contempt hearing, "STS's recordkeeping procedures [were] . . . below professional standards, causing important medical information to be obscured, and jeopardizing its residents' health"). Several of the Court Requirements in the Remedial Plan specifically addressed record-keeping procedures (see CR 79-85), thus addressing the plaintiffs' specific concerns h. and i. Prior

to STS's release from judicial oversight for these requirements, the Special Master's consultant reported that records at STS are now mostly typed, rather than handwritten and that STS has implemented "problem lists" to track individuals' ongoing medical issues. <u>See</u> Consultation and Review of Medical Services: Report to the Special Master at 24-27, U.S. v. Conn. (Feb. 17, 2006).

ii. <u>DNR and DNI Orders</u>

The plaintiffs' specific concerns j. and k. relate to the use of Do Not Resuscitate ("DNR") orders at STS. Unlike the other items in the above list, Special Master Ferleger did not address this issue in <u>United States v. Connecticut</u>.

In asserting their claims that DNR orders were written improperly, the plaintiffs rely on the district court's opinion in <u>Connecticut Ass'n for Retarded Citizens v. Thorne</u>, Civ. A. No. H-78-653, 1993 WL 765698 (D. Conn. Feb. 12, 1993), <u>rev'd on other grounds</u>, 30 F.3d 367 (2d. Cir. 1994), which held that when a decision to withhold potentially lifesaving treatment from an incompetent patient is made by a guardian appointed by the state, due process requires adherence to procedural safeguards to ensure that "the decision would reflect the wishes of the patient." The court in Thorne found that implementation of the procedures set forth in DMR directive 87-2 would satisfy due process. Id. at *11. The plaintiffs argue that the defendants in this case have violated

due process by failing to implement DMR 87-2.[7]  (Pls.' Post-Trial
Br. at 21-29.)

A DNR order allows medical professionals to withhold
cardiopulmonary resuscitation ("CPR") from a patient who is
undergoing cardiac or respiratory arrest.  DMR 87-2 allows a DNR
order to be written only with the consent of a patient or, if the
patient is not competent, with the consent of a "surrogate," who
may be a guardian, conservator, next of kin, or close relative.
(Pls.' Ex. 509.)  DMR and its personnel cannot consent to a DNR
order on behalf of STS residents.  Rather, DMR's role is to ensure
that any DNR order is "medically acceptable."  (Id.)  Under DMR 87-
2, after an attending physician has obtained consent, he or she may
write a DNR order for a patient who is in a "terminal condition,"
a state defined as "the final stage of an incurable or irreversible
medical condition which, without the administration of a life
support system, will result in death within a relatively short time
period, in the opinion of the attending physician."  (Id. (quoting

_____

[7]The problem addressed by the district court in Thorne was
that DNR orders where written by DMR doctors and residents'
guardians "without adherence to any mechanism or uniform
procedural safeguards to determine whether the decisions comply
with the wishes of the patients."  Id. at *9 (emphasis added).
The court notes that the plaintiffs have not argued that the
defendant failed to follow any procedure.  Even if the plaintiffs
were able to establish that the defendants violated DMR-87, this
fact alone would not require a finding that the defendants
violated due process.  In order to prevail on these claims, the
plaintiffs would need to show either a complete absence of any
procedure for writing DNR orders or that whatever procedures were
implemented did not satisfy due process.

24

Conn. Gen. Stat. § 19a-570(11).)  If the patient is expected to die "during the next several days or weeks," the signature of the attending physician is sufficient to create a valid DNR order. (Id.)  When the attending physician cannot make a prediction that the patient will die within this time frame, a DNR may be written for a patient who is nonetheless in the final stage of a terminal condition, but such a DNR order is subject to certain additional procedural safeguards, which include notifying the DMR Commissioner and the Attorney General.  (Id.)

DMR policy does not impose any additional procedural safeguards for the writing of a "do not intubate" ("DNI") order, which allows medical professionals to withhold additional forms of treatment designed to assist patients undergoing respiratory arrest.  (Tr. 6/30/99 at 206 (McDonald).)  A DNI order may be written only for residents who have valid DNR orders.  (Id.)

1.  Allegations that DNR Orders Were Written for Non-Terminally Ill Class Members

The plaintiffs first claim to have established that STS personnel violated the DMR's procedures by writing DNR orders for class members for whom death was not imminent.  In support of this claim, the plaintiffs cite cases in which a DNR order was written for a patient a substantial amount of time before the patient actually died.  For example, class member Gloria DeBartholomew had a DNR order in her file for six years before she died (Pls.' Ex. 301), and Agnes Vernik had a DNR order in her file for two years

25

before she died (Pls.' Ex. 282). The plaintiffs cannot meet their burden with this kind of evidence. The mere passage of time between the writing of a DNR and the patient's subsequent death does not establish that the attending physicians signed a DNR at a time when he or she could not have said that the patient was expected to die within days or weeks.

Insofar as the plaintiffs have presented expert testimony stating that DNR orders were written for patients who were not in the final stages of a terminal condition, this testimony is no more persuasive. The opinion of expert witness Dr. Robert Kugel that class member Eleanor Fuchs had a DNR in her file even though she was not terminally ill is also based merely on the passage of time between the writing of the DNR and her death two years later; this opinion does not seem to be based on an analysis of Ms. Fuchs' medical condition.[8] (See Tr. 3/22/99 at 132.) Similarly, Dr. Kugel's testimony that class member Oscar Hansen's DNR order was written at a time when "it would have seemed to me that he was not

---

[8]Further raising the Court's suspicion about Dr. Kugel's testimony is the fact that Dr. Kugel's report, as opposed to his trial testimony, does not mention his opinion that Ms. Fuchs could not have been in a terminal condition when the DNR order was written. (See Pls.' Ex. 423G at 30.) Furthermore, this conclusion is contradicted by the DNR order itself, which states that Ms. Fuchs was thought to have a 50% chance of mortality within one year. (Pls. Ex. 613.) While this seems to establish that the attending physician did not believe that the patient would die within days or weeks, it does establish that the physician had determined that Ms. Fuchs was in a terminal condition.

in imminent danger of dying" (Tr. 3/22/99 at 117) is vague and unsupported by reasoning or reference to facts. Furthermore, Mr. Hansen's DNR order was signed in 1992, before the DMR had implemented changes in the protocol for DNR orders following the decision in Thorne. (See Pls.' Ex. 509.)

Furthermore, the plaintiffs have not established that it would be a violation of due process for a state doctor to sign a DNR order for a patient who is in a terminal condition but who is predicted to die within months or years rather than days or weeks. On the contrary, DMR 87-2, a directive of which the plaintiffs seem to approve, explicitly provides for DNRs to be written under such circumstances, as long as certain officials are notified. Nowhere have the plaintiffs argued that failure to take these additional steps transforms an otherwise valid DNR into a due process violation. The court is unwilling to draw this legal conclusion. The court is therefore not persuaded by the plaintiffs' claim that the defendants violated due process when an STS doctor recommended a DNR order for class member Robert Fusco, who was in the "end-stage of a progressive and irreversible condition" and was expected to live for "months to years" with a feeding gastronomy tube.[9]

---

[9]Moreover, the plaintiffs have not established the additional procedural safeguards required by DMR 87-2 were not followed in Mr. Fusco's case. The exhibit they cite (see Pls.' Proposed Findings at 88-89) is merely a letter recommending a DNR order (Pls.' Ex. 615); it does not contain any of the documentation that would accompany a complete DNR order, and it does not establish that such documentation never existed.

(See Pls.' Ex. 615.)

The other cases cited by the plaintiffs as evidence that the defendants wrote DNR orders for non-terminally ill patients are also unhelpful. The plaintiffs' reference to the case of Sandra Zukowski is odd in this context given that no DNR order was written prior to her death, apparently because her family did not consent. (Pls.' Ex. 300.) Dr. Kugel's testimony that an STS attending physician's decision to recommend a DNR order for Elsie Backus was unjustified (see Tr. 3/22/99 at 134-35) is flatly contradicted by the consultation report of a speciality clinic that recommended a DNR "in view of advanced cancer" (Pls.' Ex. 291). Dr. Kugel testified that his opinion was based on the facts that Ms. Backus was "in good spirits" and "ambulating" when the DNR order was signed. (Tr. 3/22/99 at 135.) This explanation calls into question Dr. Kugel's helpfulness to the court as an expert witness. Similarly, Kugel's testimony that Thomas Jasinski remained under a DNR order even though he ceased be in a terminal state seems to have no basis in fact. (See Tr. 3/22/99 at 125.) There is no evidence that Mr. Jasinski ceased to be in a terminal state at any point after the DNR order was signed. The plaintiffs themselves moved into evidence a chart showing that STS staff reviewed the DNR order multiple times in 1996.[10] (Pls.' Ex. 619.)

_____

[10]The court also notes that Dr. Kugel's testimony about Mr. Jasinski's DNR order is very different from the relevant passage in Kugel's report, which only says that there was "no clear

28

2. Alleged Improper Use of DNR Orders to Withhold Treatment From Class Members Suffering From Cardiac or Respiratory Arrest Resulting from Accidents

The plaintiffs' second claim relating to DNR orders is that the defendants relied on these orders to justify withholding treatment in situations not covered by the DNR protocol. Under DMR 87-2 medical professionals may withhold CPR pursuant to a DNR order only "after respiration and cardiac function have ceased spontaneously, as a natural progression of the dying process." (Pls.' Ex. 509.) However, a DNR order does not allow medical professionals to withhold CPR from an STS resident who "aspirates food or fluid, or has any other accident that may result in death if left unattended." (Id.) The plaintiffs claim that the defendants have, in violation of DMR 87-2, implemented policies under which CPR is withheld from class members with DNR orders who experience respiratory and cardiac arrest as a result of accidents or other causes that are not the "natural progression of the dying process."

The plaintiffs contend that direct care staff and nurses, who must often make decisions about whether to perform CPR on class

documentation of [Mr. Jasinki's DNR] status" and fails to mention that Mr. Jasinski was no longer in a terminal state when he died. (Pls.' Ex. 423G at 23.) The court does not believe that Dr. Kugel, who reviewed 70 cases in preparing his report, left this detail out of his report but remembered it on the witness stand. Rather, this incident suggests that Dr. Kugel, while testifying, was somewhat too enthusiastic in offering opinions that supported the plaintiffs' case.

members discovered in respiratory distress, are directed by STS policy to withheld CPR from every resident with a DNR bracelet without considering the cause of the resident's distress. (Pls.' Post-Trial Br. 23-24.)) If proved, the existence of this policy would be problematic since it would mean that there is confusion about what class members and their guardians had actually consented to when they requested DNR orders. It would be improper for STS to obtain consent from a resident to withhold CPR should the resident undergo respiratory distress as a result of the natural progress of his or her terminal condition and then to use this consent to justify withholding lifesaving treatment in other situations.

The plaintiffs claim that STS has implemented a rule that requires staff to withhold CPR from any class member wearing a DNR bracelet, regardless of the cause of the cardiac or respiratory distress. However, this claim was contradicted by STS Medical Director Dr. Robert McDonald, who unequivocally denied that there was any such rule and explained that staff are required to perform CPR on every resident who is discovered to have choked on something, even if the resident has a DNR bracelet.[11] (Tr. 6/30/99

_____

[11] The plaintiffs misconstrue the testimony of Dr. McDonald and cite it in support of their claim. (See Pls.' Proposed Findings at 92.) Dr. McDonald's testimony seems to suggest that in cases where a resident with a DNR bracelet is found in cardiac or respiratory arrest and there is no sign of choking or any other accident, and no indication of the cause of the distress, direct care staff are instructed not to perform CPR, though they are required to call for emergency medical assistance. (See Tr. 6/30/99 at 161-62.) The testimony on this point is somewhat

at 161-62.)

The plaintiffs have not persuaded the court that Dr. McDonald's statement of STS policy is inaccurate. Kugel, the plaintiffs' expert, testified somewhat uncertainly that he did not "think" that direct care staff can distinguish between respiratory arrest caused by accidents and respiratory arrest resulting from the patient's terminal condition. (Tr. 4/5/99 at 46.) He also testified that he did not know whether nurses at STS have the necessary training to make this distinction. (Id. at 47.) Without claiming any direct knowledge, he testified that the policy at STS "seems to say" that direct care staff and nurses at STS are directed not to perform CPR on *any* resident with a DNR bracelet who is undergoing respiratory or cardiac arrest, regardless of whether the direct care staff involved are able to discern the cause of the emergency. (Id.) Kugel's inability to be more definite in describing the training of STS staff and the policy they are directed to follow makes it impossible for the court to attach much weight to his opinion.

The plaintiffs also cite the testimony of Nicholas Gabriel, the fire chief at STS, who testified at his deposition that staff

---

muddled and therefore inconclusive. In any event, the issue of
what direct care staff should do upon discovering a resident in
a state of respiratory distress of which the cause is unknown and
unknowable seems to be a difficult one. The parties have not
addressed this question, and the court is not prepared to find
that the practice described by Dr. McDonald violates due process.

are instructed to withhold CPR from residents wearing DNR bracelets who are discovered in either cardiopulmonary or respiratory arrest "no matter what the cause." (Tr. 3/31/99 at 196.) While this testimony supports the plaintiffs' claims, it is somewhat inconclusive since it was quoted from Gabriel's deposition and lacks context. It is completely unclear whether Gabriel was considering the possibility that staff would have to make decisions about whether to perform CPR on class members who are undergoing respiratory arrest as a result of, for example, a choking accident. The court therefore finds that Dr. McDonald's unequivocal statement of STS policy is more convincing.

3.  <u>Alleged Practice of Withholding Treatment Other Than CPR On the Basis of DNR Orders</u>

The plaintiffs also claim that the defendants have relied on DNR orders to withhold treatment other than CPR. Because an individual's consent to a DNR order encompasses only the withholding of CPR, and not the withholding of other kinds of medical treatment (see Pls.' Ex. 509), the court agrees with the plaintiffs that a policy of withholding treatment other than CPR would indeed violate class members' due process rights.

However, this claim is not supported by the evidence. The plaintiffs rely, in large part, on misconstruing the testimony of Dr. McDonald. For example, McDonald did not, as the plaintiffs claim, testify that a DNR order may be used to justify denying intubation to class members. (See Pls.' Proposed Findings at 89.)

32

Dr. McDonald denied this claim. (See Tr. 6/30/99 at 198 ("A DNR order and intubation are two different things.")) The plaintiffs also interpret one portion of McDonald's testimony to mean that measures other than CPR, including transfer to a hospital, may be withheld on the basis of a DNR order. (See Pls.' Proposed Findings at 90-91.) As the court understands his testimony, Dr. McDonald simply stated that treating professionals may exercise their professional judgment to withhold treatment that would not benefit a patient who has a DNR order. (Tr. 6/30/99 at 208-9.) Dr. McDonald explained that this is exactly the kind of "weigh[ing of] risks and benefits" that a medical professional must conduct before making any treatment decision about any patient, regardless of the presence of a DNR order. (See Tr. 7/8/99 at 57-58.)

There is no evidence to support the plaintiffs' claims that particular class members died after treatment other than CPR was withheld. The plaintiffs claim that class member Karen Peterson died after nutrition and fluids were withheld on the basis of a DNR order. (Pls.' Proposed Findings at 95.) However, Ms. Peterson's mortality review indicates that the decision to withhold fluid and nutrition was made by her guardian and that this decision, not the DNR order, was the basis for the action. (Pls.' Ex. 273.) The plaintiffs' evidence regarding the 1993 death of class member Mark Roy is inconclusive. Dr. Kugel stated that the decision to withhold a bronchoscopy was based on a DNR order in Roy's file.

(Pls. Ex. 432G at 15; Tr. 3/22/99 at 114-15.)  Kugel did not explain how he knows that the DNR order was the basis for the decision, and the court is unaware of any evidence supporting this claim.  Furthermore, it appears that the decision not to perform the bronchoscopy was made by Waterbury Hospital personnel rather than the defendants.  (Id.)  Similarly, the decision to remove an intubation tube from Janice Doyle prior to her death in 1993 was made by Waterbury Hospital, not STS.  (Pls.' Ex. 267.)

The plaintiffs also claim that DNR orders were used to justify "weaning class members from a ventilator."  (See Pls.' Proposed Findings at 89.)  However, the mortality review cited by the plaintiffs in support of this claim does not demonstrate that any such decision was made.  (See Pls.' Ex. 272.)

4.    Alleged Failures to Ensure that Community Hospitals Follow DNR Protocol

The plaintiffs also claim that the defendants have violated class members' due process rights by failing to address situations in which area community hospitals have written DNR orders for STS residents without following DMR protocol. (Pls.' Post-Trial Br. at 26.)  Most of the incidents to which the plaintiffs have drawn the Court's attention occurred in 1994 or shortly before.  During this period, DNR and DNI orders were apparently written for class members at community hospitals without notifying STS or involving STS in the process.  (Pls.' Exs. 260, 262, 621, 631.)  The findings of the Mortality Review Committee indicate that some of these

orders were written for patients whose medical conditions were not irreversible and thus the DNR orders do not comply with DMR 87-2. (Pls.' Exs.267, 324, 629.)

Dr. McDonald conceded that there had been problems with DNR orders written for class members at community hospitals in the past, but he testified that STS had worked to resolve these problems following his appointment as Medical Director in 1996. (Tr. 6/30/99 at 156-58; Tr. 7/8/99 at 25-27.) He testified that community hospitals are required to comply with STS policies when writing DNR orders for STS residents, and he described how STS takes action whenever it learns that a community hospital has failed to follow these policies. (Tr. 6/30/99 at 157-58, 163-68.) Dr. McDonald also conceded that there have been some problems with community hospitals in this regard since 1996. (Tr. 6/30/99 at 164.) The plaintiffs claim, however, that the defendants have not done enough to resolve these problems and point to instances after 1996 in which community hospitals apparently wrote DNR orders without following DMR protocol.

The evidence supports Dr. McDonald's testimony that STS has taken adequate precautions to ensure that community hospitals comply with DNR protocols. The Mortality Review for STS resident Jose Masso (Pls.' Ex. 281) indicates that the DNR order written by Danbury Hospital in 1996 was poorly documented and was not processed through DMR. Dr. McDonald agreed that the hospital had

35

failed to follow STS and DMR policy in this instance, and explained that he had addressed the issue with Danbury Hospital personnel. (Tr. 7/8/99 at 30; Pls.' Ex. 281.)  Similarly, in 1997, after Waterbury Hospital wrote a DNR for STS resident Dorothy Goldson without STS involvement, STS responded by reminding the hospital of the need to involve STS personnel when writing DNR orders for STS residents.  (Pls.' Ex. 295.)  McDonald addressed this issue again with Waterbury Hospital following the 1998 death of John Cherubino, whose DNR and DNI orders were written without STS involvement. (Pls.' Ex. 302; Tr. 7/8/99 at 60-61.)

The plaintiffs have not established that the defendants' efforts to force community hospitals to follow DMR protocol have been constitutionally deficient.  The defendants are not liable for the actions of community hospitals.  Of course, insofar as the defendants are aware that community hospitals frequently fail to follow proper DNR procedures, they should work to resolve the problem.  Dr. McDonald described how he informed community hospitals that they must conform to DMR policies, how he consulted with the Attorney General about the situation, and how the community hospitals are "subject to a citation" should they fail to cooperate with STS.  (Tr. 6/30/99 at 166.)  Furthermore, as an additional safeguard, all non-STS DNR orders are reviewed upon a class member's discharge from a community hospital back to STS. (Tr. 7/8/99 at 61 (McDonald).)  The court declines to find that the

defendants' efforts in this regard deviate from professional standards.

The plaintiffs argue that the defendants must establish written "memoranda of understanding" with community hospitals that guarantee that the hospitals follow DMR procedure. (Pls.' Post-Trial Br. at 28-29.) However, the plaintiffs have not drawn to the Court's attention any evidence – expert or otherwise – establishing that such memoranda are required by professional standards.[12]

5.   Other Claims Regarding DNR Orders

The plaintiffs also claim that "there is no process" for writing DNI orders at STS. (Pls.' Proposed Findings at 89.) However, the plaintiffs support their claim by mischaracterizing Dr. McDonald's testimony. (See Pls.' Proposed Findings at 89.) The testimony cited by the plaintiffs related to the fact that DMR protocol allows DNI orders to be written without any procedural safeguards beyond those required under DMR 87-2 for DNR orders. (See Tr. 6/30/99 at 201.) Because a DNI order may only be written for a patient who has a valid DNR order, it is simply not true that a DNI order may be written without following any procedure. The

---

[12]The plaintiffs quote, without citation, the "interpretive guidelines" for 42 U.S.C. § 483.460(a)(3), which, according to the plaintiffs, state that ICF/MRs must establish written agreements with outside providers of medical services. (Pls.' Post-Trial Br. at 28.) The court is unable to locate any document containing this quotation. In any event, the quotation is unhelpful since guidelines issued to interpret ICF/MR regulations do not establish constitutional norms.

plaintiffs have not argued that the constitution requires additional procedural safeguards in order for a DNI order to be written.

The plaintiffs also claim that the defendants improperly allow physicians assistants and nurses to sign reviews of DNR orders. (Pls.' Proposed Findings at 103.) The plaintiffs only evidence for this claim is a passage of Dr. McDonald's cross-examination in which plaintiffs' counsel aggressively but unsuccessfully tried to force the witness to admit that there was a deficiency in this regard. (Tr. 7/9/99 at 81-85.) Dr. McDonald explained clearly that there was "no problem" because the staff who sign DNR reviews do so under the supervision of doctors. (Id.) He testified that any previous problems in this area had been corrected. (Id.)

The court therefore finds that the plaintiffs have failed to establish that the defendants' policies and practices for writing DNR and DNI orders for class members violate due process.

B.  Protection From Harm and Freedom From Unnecessary Restraint

The plaintiffs claim that the defendants have violated their constitutional duty to protect residents at STS from abuse, neglect and injury. (Pls.' Post-Trial Br. at 48-67.) As with the plaintiffs' claims relating to the provision of medical care, the plaintiffs set out a list in their Post-Trial Brief of specific matters for which they request a remedy. The plaintiffs state that they do not know if the Special Master has addressed all of these

38

matters and suggest that "that the appropriate course is to request orders to remedy the violations plaintiffs established at trial, and to ask that they be referred to the process established in [United States v. Connecticut] provided plaintiffs can participate fully in the process." (Id. at 168). The plaintiffs would have the following specific orders implemented by the Special Master:

a.    An order requiring the defendants to provide physical safety, freedom from restraint and programming that is sufficient to satisfy the requirements of Youngberg.

b.    An order requiring the defendants to investigate abuse, neglect and injuries to class members and that STS unit staff members should be prohibited from investigating injuries of unknown origin.

c.    An order requiring adequate reporting, investigation and corrective action in response to all abuse, neglect and injuries.

d.    An order requiring the defendants to "take all reasonable steps" to prevent resident-to-resident sexual assaults.

e.    An order requiring the defendants "to take all reasonable and necessary steps" to prevent resident-to-resident assaults.

f.    An order requiring the defendants to provide prompt medical care to class members who have been injured or abused.

g.　An order requiring the defendants to maintain data regarding injuries, abuse, neglect, and the use of restraints at STS.

h.　An order requiring the defendants to use this data in taking corrective action.

i.　An order requiring adequate staffing of the STS Human Rights Office.

j.　An order requiring the defendants to take reasonable steps to reduce the use of restraints at STS.

k.　An order requiring that buildings at STS be inspected and brought into compliance with the state Fire Code.

(Id. at 168-70.)

The issue of abuse and neglect at STS was an important aspect of the litigation in United States v. Connecticut. See, e.g., 931 F. Supp. at 978 (finding that "STS [had] not only failed to protect its residents from injury to themselves, but [had] also failed to protect its residents from unreasonable risk of injury by other residents"). The Special Master accordingly devoted considerable attention to abuse and neglect at STS. Eleven of the Court Requirements in the Remedial Plan dealt with this issue. See CR 2-12.

The Remedial Plan focused on establishing procedures to investigate and respond to instances of abuse and neglect. Court Requirement 4 required that STS implement procedures for

systematically recording and tracking instances of abuse, neglect and injuries and required STS to take corrective action based on the data generated from these reports. See Special Master's Report to the Court No. 49: Investigation of Abuse/Neglect Allegations ("Report No. 49") at 9-10, U.S. v. Conn. (May 27, 2003) (describing use of the Connecticut Automated Mental Retardation Information System ("CAMRIS") to track reports of abuse). The Remedial Plan required that STS set standards and establish procedures for reporting and investigating abuse committed both by staff and residents at STS. See CR 6-11; see also Report No. 49 at 2-8 (describing the emergence of a "professional," "effective" and adequately resourced Human Rights Office tasked with investigating abuse at STS). Therefore, the Special Master has addressed the plaintiffs' specific concerns a., b., c., f., g., h. and i.

In addition to requiring STS to investigate and respond to abuse and neglect, the Remedial Plan required STS to take steps to prevent abuse and neglect. Court Requirement 3 required STS to identify potential victims and abusers, implement programs to prevent victimization, and train staff and clients to recognize and report abuse and neglect. See, e.g., Report to the Court No. 54: Abuse/Neglect Client Training, U.S. v. Conn. (Jan. 20, 2004). Therefore, the Special Master has addressed the plaintiffs' specific concerns d. and e.

The specific order k. from the above list of the plaintiffs'

requests relates to an issue – fire code compliance – that has already been addressed in the United States v. Connecticut remedial process. See CR 86, 87; see also Special Master's Report to the Court No. 59: Deletion of Several Requirements at 6-7, U.S. v. Conn. (Oct. 24, 2005) (noting that fire marshal inspections and ICF/MR inspections had been satisfactory).

Lastly, the Special Master has already addressed the issue of reducing unnecessary use of restraints on class members. See, e.g., CR 48, EC 1-6 (prohibiting use of restraints in lieu of training and requiring systematic review of use of restraints). Also, as discussed below, the Special Master oversaw the improvement of habilitation programming, thus reducing the need to use physical restraint. It is therefore apparent that the Special Master has already addressed the issue raised by the plaintiffs' specific concerns a. and j.

The Special Master has already addressed all of the security and freedom from restraint issues that the plaintiffs would have the court refer to him. The court therefore will not consider whether the defendants are liable for having failed to protect class members from harm and unnecessary restraint.

C.    Habilitation and Active Treatment

The plaintiffs claim that the defendants have violated class members' due process rights to minimally adequate habilitation and training and they claim that the defendant Commissioner of DMR

42

violated class members' right to receive active treatment as required by Title XIX of the Social Security Act. (Pls.' Post-Trial Br. at 67-69.) Class members have a due process right to training or habilitation that is adequate to "ensure [their] safety and to facilitate [their] ability to function free from bodily restraints." Youngberg, 457 U.S. at 324. Such training must be "sufficient to prevent basic self-care skills from deteriorating." Society for Good Will, 737 F.2d at 1250. State officials violate due process when they "fail to exercise professional judgment in devising programs that allow patients to live as humanely and decently as when they entered the school." Id. Class members do not, however, have a due process right to training that will "improve [their] . . . skills beyond those with which they entered" STS. See Society for Good Will, 737 F.2d at 1250 (adopting Justice Blackmun's concurring opinion in Youngberg).

"Active treatment," as the term is used in Title XIX, refers to a level of training and treatment that is more intensive than that required by due process. The regulations promulgated to implement Title XIX explain that

> [e]ach client must receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart, that is directed toward . . . [t]he acquisition of the behaviors necessary for the client to function with *as much self determination and independence as possible* [as well as] [t]he prevention or deceleration of regression or loss of current optimal functional status.

43

42 C.F.R. § 483.440(a) (emphasis added). Under Title XIX, unlike the Due Process Clause, the class members enjoy a right to training and other treatment designed to do more than simply preserve basic skills.

When they submitted their Post-Trial Brief, the plaintiffs were aware that the Special Master in United States v. Connecticut had addressed or would be addressing many of the alleged deficiencies in STS's habilitation programming. (Id. at 170.) However, because they were "uncertain as to the extent" that these alleged violations would be addressed in the remedial process in that case, they have also requested a number of specific remedial orders in this case. (Id. at 170-71.) The court construes this request for relief as a request that the court remedy any specific issues related to habilitation which the Special Master failed to address.

The plaintiffs request the following specific remedial orders to fill any gaps that may have been left in the Special Master's oversight over reform of the habilitation services at STS:

a. An order requiring the defendants to provide each class member with "minimally adequate habilitation" that is to be monitored by a mental health professional.

b. An order requiring the defendants to provide class members with the level of habilitation that a professional would consider adequate to ensure safety and

to allow freedom from restraint.

c.    An order prohibiting STS from administering unnecessary medication and restraint and requiring the defendants to provide habilitation to reduce the need for medication and restraint.

d.    An order requiring the defendants to "ensure full participation in social, religious, and community group activities."

e.    An order requiring the defendants to "promote the participation of legal guardians . . . in the process of providing active treatment."

f.    An order requiring the defendants to promote informal leave, vacations, and trips away from STS.

g.    An order requiring the defendants to provide each class member with "an active treatment program consistent with his/her needs."

h.    An order requiring "professional program staff" to participate in IDT meetings relating to habilitation programming.

i.    An order requiring the defendants to provide sufficient, adequately trained staff to implement habilitation programs.

j.    An order requiring the defendants to provide active treatment designed to promote class members' independence

to prevent loss of functioning, thus meeting the standards established in the relevant ICF/MR regulations.

k. An order requiring the defendants to ensure that IDTs, in accordance with the relevant ICF/MR regulations, provide each class member with habilitation plans.

l. An order "requiring the defendants to develop and implement [a] behavior management plan for each class member who needs one through the [IDT] process."

m. An order requiring that behavior modifying medications are "monitored closely . . . "in conjunction with [a] physician . . . and the [IDT]" and that such medications "are gradually withdrawn at least annually . . . unless clinical evidence justifies that this is contraindicated."

n. An order requiring IDTs to determine the "most integrated day program or supported work program appropriate to [each] class member's needs."

o. An order requiring the defendants to "provide community-integrated employment and other day time activities in the most integrated setting appropriate to the class member's needs."

p. An order requiring the defendants to "provide opportunities for class members to participate in recreation and leisure activities in the community off

the grounds of [STS]."

(Id. at 171-74.)  As the following discussion makes clear, the Special Master has addressed all of the issues underlying these proposed orders and there is no need for the court to revisit any of them.

The Remedial Plan in United States v. Connecticut addressed habilitation programming at STS extensively.  See CR 41-44, 46-52; see also United States v. Connecticut, 931 F. Supp. at 978 (citing a study finding that STS had failed to provide the "continuous, aggressive, and active treatment programs" necessary to prevent STS residents from injuring themselves); id. at 982-84 (describing STS's failure to provide physical therapy services).  In 2005, a final compliance evaluation commissioned by the Special Master found that habilitation services at STS were generally meeting residents' needs.  Report to the Court No. 60: Habilitation ("Report No. 60") at 11-13, U.S. v. Conn. (Jan. 17, 2006) (citing the report of Dr. Edward Skarnulis).  In 2006, the court released STS from judicial oversight over the Court Requirements relating to habilitation programming.  Order, U.S. v. Conn. (Jan. 18, 2006).

Much of the Special Master's work on habilitation was directed at ensuring that individualized habilitation programming was made available to each resident of STS.  Court Requirements 41 to 43 required that STS create a habilitation plan for each resident and that STS review and update this plan periodically.  Under the

Special Master's supervision, STS implemented the Overall Plan of Service/Habilitation Initiative ("OPS Initiative"), which was designed to make individualized habilitation programming available for all STS residents. See Ruling on Case Management Plan Compliance, U.S. v. Conn. (Nov. 22, 2005) (describing the OPS Initiative as "designed to move from 'deficit driven plans to planning from peoples' strengths and preferences . . . , [that is] to a person-focused model'") (quoting Report to the Court No: 52: Case Management ("Report No. 52"), vol. 8 at 27 (Oct. 29, 2003). Thus, the Special Master addressed the plaintiffs' specific remedial orders a., g., and *l*.

In evaluating the training provided at STS, the Special Master and his consultants considered whether the programs provided met the requirements of the ICF/MR regulations. See Report No. 60 at 12 (explaining that Dr. Skarnulis, in his final compliance evaluation, had incorporated the active treatment standards from the ICF/MR regulations, which contemplate a more aggressive approach to training with the goal of enhancing patients' self-sufficiency and ability to enjoy productive lives in addition to preventing patients from losing basic skills they currently possess); see also Habilitation Services at Southbury Training School at 7-9, U.S. v. Conn. (Nov. 17, 2005) (Report of Dr. Skarnulis). Thus, the Special Master addressed the concerns underlying plaintiffs' remedial orders j. and k.

The Special Master oversaw improvements in the procedures used for planning and monitoring habilitation programming. The Remedial Plan required implementation of a "case management" system in which case managers would coordinate all aspects of the services provided to STS residents, including habilitation programming. See CR 45. Under the plan, Case Managers must be qualified "mental retardation professionals," as defined by the ICF/MR regulations and are responsible for ensuring that each resident's Overall Plan of Service is prepared and implemented and that residents receive services responsive to their needs. Report to the Court No. 52, vol. 8 at 7-10. Thus, the Special Master addressed the plaintiffs' specific concerns a., h., and k.

The Remedial Plan required that STS provide sufficient numbers of staff who were qualified to implement the OPS Initiative, thus addressing the plaintiffs' specific concern i. See CR 14 (addressing qualifications for direct care staff); CR 27 (requiring recruitment to fill positions for occupational, physical and speech therapy specialists); see also CR 13 (setting ratios of supervisory to direct care staff). By 2006, when the court released STS from judicial oversight over the Court Requirements relating to habilitation, "[i]mplementation of habilitation services [had been] the focus of more staff at STS than any other discipline." See Report No. 60 at 3.

The Remedial Plan also required STS to implement policies that

would reduce or eliminate unnecessary use of medication and physical restraint in response to residents' "challenging behavior." See CR 46-52; see also Order Purging Defendants of Contempt and Ending Active Judicial Oversight at 9-11, U.S. v. Conn. (Mar. 24, 2006) (mentioning improvements in habilitation programming at STS and comparing the current state of affairs with the situation in 1996, when STS frequently used medication to modify residents behavior in lieu of habilitation). Thus, the Special Master addressed the issues underlying the plaintiffs' specific remedial orders b. and c.

The Remedial Plan mandated the provision of day programs and vocational programs to residents, thus addressing the issues underlying the plaintiffs' specific remedial orders n., o., p., and, to some extent d. and f. See CR 44. The court notes that the plaintiffs, in item e. from the list above, also request an order requiring that STS promote the participation of parents and guardians in the process of providing habilitation. To some extent, the Remedial Plan addressed the issue of the involvement of parents and guardians with the care of their children and wards. See CR 45 (establishing duties of case manager with respect to providing information to parents and guardians); CR 71. However, it is not clear that the plaintiffs would ever be entitled to an order like this. The constitution always requires the court to defer to the judgments of professionals, and, therefore, the court

cannot require the defendants to conduct habilitation programming in any particular manner.

The remaining remedial order requested by the plaintiffs, m. from the list above, relates to the use of behavior-modifying medication. The court has already discussed how the Special Master has addressed this issue and has concluded that the claims underlying the particular relief requested have been rendered moot. See § IIIA supra.

*      *      *

With the few exceptions indicated in the preceding discussion, the Special Master has remedied the alleged deficiencies which the plaintiffs would have the court refer to him. Because the plaintiffs do not request any additional relief addressing alleged violations in the areas of medical care, security or habilitation, the court finds that the claims relating to these issues are moot.

The court notes, however, that the plaintiffs ask the court to "leav[e] to a later date the question as to whether the remedial process established in United States v. Connecticut can address all of the violations of law established [in this case]." (Pls.' Post-Trial Br. at 164-65, 168.) Because the court is confident the plaintiffs' concerns have been fully addressed, it does not anticipate that it will be necessary to face this question. Should the plaintiffs seek additional relief in these areas beyond what has been achieved in United States v. Connecticut, it remains to be

seen whether the plaintiffs, having elected to seek relief from the Special Master's remedial process, will be entitled to an extensive examination by the court into the adequacy of that process.

In addition, the court notes that the plaintiffs have, in some instances, asked to be allowed to participate in the Special Masters's efforts to resolve the deficiencies they claim to have established. (<u>See</u>, <u>e.g.</u>, Pls.' Post-Trial Br. at 164-65.) For obvious reasons, this relief is currently unavailable.

IV.  <u>Community Placement</u>

The plaintiffs claim that the defendants have failed to exercise professional judgment in determining whether class members should be placed in the community. Unlike the majority of the plaintiffs' other claims, the issue of community placement was not addressed or resolved in the <u>United States v. Connecticut</u> litigation. See Ruling on Plaintiff's Motion to Adopt the Special Master's Findings and Recommendations Regarding Community Placement, U.S. v. Conn. (Jan. 24, 2001) (declining to adopt the Special Master's recommendations on community placement and holding that community placement issues would be addressed in the present litigation); <u>see also</u> Order, <u>U.S. v. Conn.</u> (Jan. 7, 2003) (removing the issue of community placement from the <u>United States v. Connecticut</u> litigation). Therefore, the court will now consider whether the plaintiffs have established the alleged constitutional

52

and statutory violations by showing that the defendants failed adequately to place class members in the community.

A.    The Due Process Requirement of Professional Judgment in Community Placement Decisions

Residents of a state-run institution for the mentally retarded have no constitutional right to community placement. Society for Good Will, 737 F. 2d at 1249 (citing Phillips v. Thompson, 715 F.2d 365, 368 (7th Cir. 1983) and Garrity v. Gallen, 522 F. Supp. 171, 237-39 (D.N.H. 1981)). Nor is there a constitutional right to the "least restrictive environment." Id. (citing cases). Community placement decisions are, however, subject to scrutiny under Youngberg. Id. Like any other decision to place restraints on a patient's freedom, the decision to keep a resident in an institution instead of placing the resident in a community setting must be "a rational decision based on professional judgment." Id. at 1249; see also Clark v. Cohen, 794 F.2d 79, 87 (3d Cir. 1986); Thomas S. v. Flaherty, 902 F.2d 250, 255 (4th Cir. 1990). As in any other application of the Youngberg standard, the court's role in evaluating a decision to keep a mentally disabled individual in an institution is a "narrow one," and the court must defer to the judgment of the state's medical professionals. David v. Cuomo, 862 F. Supp. 34, 37 (W.D.N.Y. 1994) (suggesting that if, for example, "a patient were being held against his will contrary to all the medical evidence and expert medical opinion, there would clearly be a constitutional violation").

B.    Community Placement Under the ADA and Section 504

The plaintiffs also claim that the defendants' procedures for making community placement determinations violated Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, and Title II of the ADA, codified at 42 U.S.C. §§ 12131-12165, both of which were enacted to prohibit discrimination against disabled persons in the provision of public services.  In Olmstead v. L.C., 527 U.S. 581, 589 n.1 (1999), the Supreme Court explained that the ADA was the federal government's "most recent and extensive endeavor to address discrimination against persons with disabilities."  In enacting the ADA, Congress recognized that "discrimination against individuals with disabilities continues to be a serious and pervasive social problem;" that such discrimination "persists in such critical areas as . . . institutionalization;" and that the forms of discrimination encountered by individuals with disabilities include "outright intentional exclusion, . . . failure to make modifications to existing facilities and practices,  . . . [and] segregation."  Id., 527 U.S. at 588-869 (quoting 42 U.S.C. § 12101(a)(2), (3), (5)).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To

establish a prima facie violation of § 12132, a plaintiff must show 1) that he or she is a "qualified individual with a disability;" 2) that he or she is being excluded from participation in or being denied the benefit of some service, program or activity by reason of his or her disability; and 3) that the entity that provides the service, program or activity is a public entity. <u>Civic Ass'n of Deaf v. Giuliani</u>, 915 F. Supp. 622, 634 (S.D.N.Y. 1996) (citing <u>Clarkson v. Coughlin</u>, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995)).[13]

It is undisputed both that class members are qualified individuals with disabilities and that STS is a public entity. The plaintiffs argue that they have established that class members have been "excluded from participation in or denied the benefit of a service, program or activity" in two different ways. First, the plaintiffs argue that the defendants have violated the "integration mandate" set forth in the federal regulations interpreting the ADA. Second, the plaintiffs claim that defendants DMR and STS discriminated on the basis of severity of disability by refusing to consider severely disabled STS residents for community placement.

---

[13]A prima facies case under Section 504 is established in the same manner. <u>Messier</u>, 1999 WL 20910 at *8 n.7 (citing <u>Rothschild v. Grottenthaler</u>, 907 F.2d 286, 289-90 (2d Cir. 1990)); <u>see also Frederick L. v. Dep't of Pub. Welfare</u>, 364 F.3d 487, 491 (3d Cir. 2004). The only relevant difference between the two statutes is that Section 504 applies to entities receiving federal financial assistance, whereas Title II of the ADA applies to all public entities. <u>Pierce v. County of Orange</u>, 519 F.3d 985, 1010 n.27 (9th Cir. 2008).

I.  The Integration Mandate

Section 12134(a) instructed the Attorney General to issue regulations implementing § 12132's prohibition on discrimination. In response, the Attorney General promulgated regulations that express a preference for community-based placement over institutionalization, where appropriate. In particular, 28 C.F.R. § 35.130(d)) provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." The "most integrated setting" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35 app. A; quoted in Olmstead, 527 U.S. at 593. "In short, where appropriate for the patient, both the ADA and [Section 504] favor integrated, community-based treatment over institutionalization." Frederick L., 364 F.3d at 491-92.

This court has previously held that the plaintiffs may prove discrimination by showing that the defendants keep class members at STS despite determinations by DMR professionals that community placement is appropriate. Messier, 1999 WL 20910 at *10. Further guidance as to how the court should interpret Title II of ADA and the guidelines implementing it is offered by the Supreme Court's subsequent decision in Olmstead. In that decision, the Supreme Court considered the claims of two mentally retarded women who

56

remained in an institution in Georgia despite the opinions of the women's treating professionals that available community-based programs met their needs. <u>Olmstead</u>, 527 U.S. at 593. The court held that the state had violated § 13132 by keeping the women in an institution and explained that under the ADA and the guidelines interpreting it

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

<u>Id.</u> at 607.

The Supreme Court found that the interpretive guidelines "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." <u>Id.</u> at 598 (quoting <u>Bragdon v. Abbott</u>, 524 U.S. 624, 642 (1998) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-140 (1944))); <u>See also</u> <u>Helen L. v. DiDario</u>, 46 F.3d 325, 331-32 (3d Cir. 1995) (giving deference under <u>Chevron v. Natural Res. Defense Council</u>, 467 U.S. 837 (1984), to the Attorney General's interpretation of Title II), <u>cert. denied</u>, 516 U.S. 813 (1995). Importantly, the Supreme Court approved of the Attorney General's interpretation of what constitutes unlawful discrimination under § 13132. The Court rejected the notion that proof of discrimination in this context requires a showing of unequal treatment among similarly situated

individuals.  The Court concluded that Congress intended for the ADA to do more than simply prohibit unequal treatment, and the Court held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." Id. at 597.  The Court reasoned that the Attorney General's interpretation of the Title II prohibition on discrimination reflected the judgment that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." Id. at 600 (citing Allen v. Wright, 468 U.S. 737, 755 (1984) and Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 707, n.13 (1978)).  The Supreme Court further noted that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Id., 527 U.S. at 601.

While the plaintiffs may establish a prima facie violation of Title II by showing that the defendants have failed to comply with the regulations' integration mandate, "nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." Id. at 601-602.  A state "generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility

requirements' for habilitation in a community-based program." <u>Id.</u> at 602 (citing 28 C.F.R. § 35.130(d). In considering whether an individual has been unjustifiably isolated in an institution, the court "normally should defer to the reasonable medical judgments of public health officials." <u>See</u> <u>School Bd. v. Arline</u>, 480 U.S. 273, 288 (1987); <u>cited in</u> <u>Olmstead</u>, 527 U.S. at 602.

ii. <u>Discrimination on the Basis of Severity of Disability in Community Placement Decisions</u>

The plaintiffs also claim they have established a violation of the ADA by showing that the defendants have failed to consider certain severely retarded class members for community placement. The Attorney General's regulations implementing the Title II of the ADA make it clear that a state cannot discriminate on the basis of severity of disability in providing services. 28 C.F.R. § 35.130 provides that

> A public entity, in providing any aid, benefit, or service, may not . . . [p]rovide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others, unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others.

<u>See also</u> <u>Helen L.</u>, 46 F.3d at 336, ("[I]f Congress were only concerned with disparate treatment of the disabled as compared to their nondisabled counterparts," then the ADA's reference to the persistence of discrimination in institutionalization would constitute a "non sequitur"); <u>Williams v. Wasserman</u>, 937 F. Supp.

524, 530 (D. Md. 1996) (holding that "the ADA does oblige the defendants to make [a program of community-based treatment options] available to otherwise qualified individuals without regard to the severity or particular classification . . . of their disabilities"). Hahn v. Linn Cty., 130 F. Supp.2d 1036, 1050 (N.D. Iowa 2001). See also Martin v. Voinovich, 840 F. Supp. 1175, 1191-92 (S.D. Ohio 1993); Jackson v. Fort Stanton Hosp. & Training Sch., 757 F. Supp. 1243, 1299 (D.N.M.1990) ("The severity of plaintiffs' handicaps is itself a handicap which, under § 504, cannot be the sole reason for denying plaintiffs access to community programs"), rev'd on other grounds, 964 F.2d 980 (10th Cir. 1992); Conner v. Branstad, 839 F. Supp. 1346, 1356 (S.D. Iowa 1993); Garrity v. Gallen, 522 F. Supp. 171, 214-15 (D.N.H. 1981); Lynch v. Maher, 507 F. Supp. 1268, 1278-79 n.15 (D. Conn. 1981).

Consistent with these interpretations of the law, this court has previously held that the plaintiffs may show that the defendants "violate the ADA and Section 504 by refusing to consider severely handicapped STS residents for community placement or vocational rehabilitation on the basis of severity of disability." Messier, 1999 WL 20910 at *10.

iii. Defenses Under the ADA and Section 504

There is no "federal requirement that community-based treatment be imposed on patients who do not desire it." Olmstead, 527 U.S. at 602 (citing 28 C.F.R. § 35.130(e)(1)). Therefore, the

defendants may rebut a prima facie case by showing that they offered community placements to qualified STS residents and that the residents declined.

The defendants may also rebut a prima facie case by establishing that the relief sought by the plaintiffs would require a "fundamental alteration" of the state's mental health system. Frederick L., 364 F.3d at 493-94. This defense is derived from the regulations implementing the ADA, which provide that

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7) (1998); quoted in Olmstead, 527 U.S. at 592.[14] The "fundamental alteration" defense is an affirmative defense; once the plaintiffs have established a prima facie case, the burden shifts to the defendants to establish that the remedy sought requires something more extensive than a reasonable modification of existing policies. Frederick L., 364 F.3d at 492 n. 4.

Determination of whether a modification is "'reasonable' involves a fact-specific, case-by-case inquiry that considers,

---

[14]The Rehabilitation Act imposes the same "reasonable modifications" requirement. See Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir. 1995) (citing cases). For all relevant purposes, the legal analysis required by Section 504 is identical to the analysis under the ADA.

among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995) (citing D'Amico v. New York State Bd. of Law Examiners, 813 F. Supp. 217, 221-22 (W.D.N.Y. 1993)). The state is not required to achieve integration at any cost, and the unreasonable cost to the state of implementing or expanding community-based programs may be one factor in establishing a fundamental alteration defense. See Helen L., 46 F.3d at 339; Toledo v. Sanchez, 454 F.3d 24, 39 (1st Cir. 2006); Cable v. Dept. of Developmental Servs., 973 F. Supp. 937, 942 (C.D. Cal. 1997). However, a state's budgetary constraints alone will not excuse failure to comply with Title II or Section 504. Helen L., 46 F.3d at 339; Pennsylvania Protection and Advocacy, Inc. v. Pennsylvania Dept. of Publ. Welfare, 402 F.3d 374, 381 (3d Cir. 2005); see also Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175 (10th Cir. 2003) ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed."); Bruggeman v. Blagojevich, 219 F.R.D. 430, 434 (N.D. Ill. 2004) (holding that a fundamental alteration defense "requires a court to weigh and to balance . . . (1) the resources available to a state; (2) the range of services a state provides those with mental disabilities; and (3) a state's obligation to mete out those services equitably").

iv.  <u>Eleventh Amendment Immunity to Suit Under the ADA</u>

The defendants argue that the plaintiffs' ADA claims are barred by the Eleventh Amendment, which has been interpreted to preclude suits brought in federal courts under federal law against a state or its agencies.  <u>See Hans v. Louisiana,</u> 134 U.S. 1 (1890); <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984). The plaintiffs contend that the ADA abrogated states' Eleventh Amendment sovereign immunity. (Plaintiffs' Br. Addressing the Applicability of <u>Bd. of Trustees v. Garrett</u> at 1-16 (Doc. No. 843).)  The defendants respond that the Supreme Court's decision in <u>Bd. of Trustees v. Garrett</u>, 531 U.S. 356 (2001), demonstrates that the ADA did not abrogate the state's Eleventh Amendment sovereign immunity, and, therefore, that the plaintiffs cannot sue under the ADA.

If the defendants are correct, then their Eleventh Amendment arguments apply only to the claims against STS, which is the only state agency sued in this case.  <u>Ex parte Young</u>, 209 U.S. 123 (1908), established an exception to Eleventh Amendment immunity that allows for federal law suits seeking prospective relief against state officials who are sued in their official capacities. <u>Edelman v. Jordan</u>, 415 U.S. 651 (1974); <u>State Employees Bargaining Agent Coalition v. Rowland</u>, 494 F.3d 71, 94 (2007).  The injunctive relief sought by the plaintiffs for alleged ongoing violations of the ADA and Section 504 is properly characterized as prospective.

See <u>Verizon Maryland, Inc. v. Public Service Com'n of Maryland</u>, 535
U.S. 635, 645 (2002) ("In determining whether the doctrine of <u>Ex
parte Young</u> avoids an Eleventh Amendment bar to suit, a court need
only conduct a 'straightforward inquiry into whether [the]
complaint alleges an ongoing violation of federal law and seeks
relief properly characterized as prospective'") (quoting <u>Idaho v.
Coeur d'Alene Tribe</u>, 521 U.S. 261, 296 (1997)). The plaintiffs'
claims against the defendants Commissioner of DMR and the Director
of STS fall squarely within the <u>Ex parte Young</u> exception.[15]  <u>See
Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 288 (2d Cir. 2003)
(holding that "an individual sued in his or her official capacity
under the doctrine of <u>Ex parte Young</u> is . . . subject to liability
under the ADA"); <u>Randolph v. Rodgers</u>, 253 F.3d 342 (8th Cir. 2001)
(allowing official-capacity claims against state officials under
ADA and Section 504); <u>Miranda B. v. Kitzhaber</u>, 328 F.3d 1181,
1187-88 (9th Cir. 2003).

Resolution of the question of whether or not the plaintiffs
may sue STS itself, as opposed to the STS Director and the DMR

---

[15]The plaintiffs do not specify in their Third Amended
Complaint whether they have sued the defendants in their official
or personal capacities, but it is clear that this suit seeking
injunctive relief against STS and DMR is an official-capacity
suit.  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985)
("Personal-capacity suits seek to impose personal liability upon
a government official for actions he takes under color of state
law [while] [o]fficial-capacity suits, in contrast, generally
represent only another way of pleading an action against an
entity of which an officer is an agent.") (citations and
quotations omitted).

Commissioner, for violations of the ADA would have no practical impact on the outcome of this case. An order granting injunctive relief against the state officials responsible for operating STS would have the same practical effect as an order granting injunctive relief against STS itself. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (quotations omitted) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent," and "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003) ("The real party in interest in an official-capacity suit is the government entity.") The court therefore sees no need to reach this difficult constitutional issue.

C. Community Placement at STS

The plaintiffs have devoted a significant part of their case to demonstrating that community placement has substantial benefits for mentally disabled individuals who would otherwise be confined in an institution. According to the plaintiffs' experts, many mentally retarded individuals who leave institutional settings and are placed in the community demonstrate improvements in quality of life, improvements in health, improvements in communication and

65

other skills, and decreases in challenging behavior. (See, e.g.,
Pls.' Ex 423H at 4-14 (Conroy Report) (reviewing studies of
community placement out of other institutions); Tr. 3/8/99 at 24-25
(LaVigna).) For their part, the defendants do not dispute that
community placements may benefit many mentally disabled
individuals, but their experts dispute the notion that "movement to
the community is somehow therapeutic." (Tr. 6/9/99 at 148 (Walsh);
see also Defs.' Ex. 13C (Walsh's Rebuttal Report).) The defendants
claim that the plaintiffs' experts are unreliable[16] and that

---

[16]One of the defendants' arguments about the reliability of
the plaintiffs' experts is based on Federal Rule of Evidence 702,
which governs the qualification of expert witnesses and the
admissibility of their testimony at trial. Relying on Rule 702
and cases such as Daubert v. Merrell Dow Pharmaceuticals, 509
U.S. 579 (1993), which interpret that rule, the defendants argue
that all of the plaintiffs' witnesses are unreliable. (Defs.'
Post-Trial Br. at 7-19.) These cases are simply inapplicable
here because the experts have already testified and the
evidentiary phase of the trial is complete. The defendants did
not object when the plaintiffs moved to qualify their experts as
witnesses. (See, e.g., Tr. 2/9/99 at 148 (certifying plaintiff's
witness Dr. Sue Gant as an expert without objection by the
defendants); Tr. 2/3/99 at 40; Tr. 3/8/99 at 52.). The court
does not believe that the defendants raised the Daubert issue at
any point before the plaintiffs rested, and they cannot raise the
Daubert issue now. See, e.g., Macsenti v. Becker, 237 F.3d 1223,
1233-34 (10th Cir. 2001) (reasoning that "enforcement of the
requirement for the Daubert analysis [is] premised on a party's
objection" and that such objections are waived if not raised at
the proper time). Of course, the court must evaluate the
testimony of all witnesses, and it will discount the testimony of
any witness – expert or lay – who gives testimony that is
incredible or unreliable. The defendants are free to argue that
any particular witness' testimony should not be relied upon.
However, the defendants' blanket argument that the plaintiffs'
witnesses did not satisfy the gate-keeping requirements of Rule
702 is misplaced.

community placement may have negative effects. For example, the defendants point out that difficulties may arise in ensuring effective monitoring and oversight over the provision of services to mentally retarded individuals living in the community, (Tr. 5/28/99 at 44 (Strauss)), and that it may be more difficult for individuals living in the community to gain access to specialist medical professionals (Tr. 6/9/99 at 148 (Walsh)).

The court does not take a position in a policy debate about the virtues of deinstitutionalization. The court does not doubt that placement in the community would be beneficial for many class members, but community placement may not be a possibility or a necessity for every class member. As the court has said in a previous ruling:

> The most that plaintiffs can accomplish is to require STS to conform with its constitutional and statutory duty to consider the appropriateness of community placement. In no way can the plaintiffs force STS to place in community settings those for whom community placement is inappropriate. There can be little disagreement that having the right to choose between institutionalization and community placement will benefit [class members].

Messier, 183 F.R.D. at 358. Congress, in enacting the ADA, and the Attorney General, in issuing regulations interpreting the ADA, have made the judgment that mentally retarded individuals should live in the most integrated setting that is appropriate to their needs. The court must do what it can to give effect to this statutory preference for integration, while keeping in mind that it must defer to the judgment of the defendants' medical and mental health

67

professionals in determining whether community placement is appropriate for individual class members.

STS is not an integrated setting. It is a segregated institution in which all residents are mentally disabled. Furthermore, STS is a relatively isolated campus in a rural setting. (Tr. 2/10/99 at 171 (Gant); Tr. 3/2/99 at 134 (Bondy).) With the exception of day programs, residents of STS have limited opportunities to interact with people from outside the institution or with non-disabled people. (Tr. 2/10/99 at 171-74 (Gant).)

Few STS residents were placed in the community in the years preceding the trial. According to STS Director Charles Hamad, in the fiscal years 1996, 1997 and 1998, the number of community placements for STS residents was, respectively, 19, 12, and 21. (Tr. 9/13/99 at 83.)[17] The plaintiffs claim that there are many more class members who would like to live in the community and who would be found qualified for community placement if professional judgment were exercised. The defendants do not seem to dispute that many or all class members could be placed in the community

_____

[17]There is some uncertainty in the record about the numbers of STS residents who have been placed. Gant's review of STS documents indicated that 66 residents had been placed between August 1994 and the end of 1998 (Tr. 2/12/99 at 61-63.) According to Gant, the placements for each fiscal year were as follows: 11 in 1994, 19 in 1995, 12 in 1997, and 3 in 1998. (Id.) George Moore, who was an assistant director and then later a co-director at STS between 1995 and the date of the trial, testified that he believed that there had been 73 placements in the community between 1995 and the trial. (Tr. 9/27/99 at 74.)

under the right circumstances. The defendants' witnesses, including officials at STS, rejected a so-called "readiness model" and testified that anyone currently placed at STS could live in the community if provided with the appropriate "supports and services." (See, e.g., Tr. 9/13/99 at 114, 134 (Hamad); Tr. 3/30/99 at 154 (Mulvey); Tr. 6/9/99 at 144-45 (Walsh) (rejecting the notion that there is a "must stay group" of class members and taking the view that "[i]f you spend enough money you can serve anybody anyplace").)

I.  IDT Community Placement Recommendations From 1996 Until the Trial

The services and treatment to be provided to each STS resident are determined by an Interdisciplinary Team ("IDT"), which is composed of the resident and his or her relatives, guardians and advocates, staff from the resident's residential and day programs, the resident's case manager, and various medical and/or programming specialists. (Tr. 2/26/99 at 58-59 (Ale); Pls.' Ex. 401 (DMR-1, DMR-11).) DMR policy dictates that IDT members are to "share all information and recommendations" with each other, and "decisions should be made by consensus." (Tr. 2/26/99 at 66 (Ale) (quoting DMR 11-5).) The IDT records its decisions, goals and recommendations in the resident's Overall Plan of Service ("OPS"),[18]

---

[18]The OPS is a "document which specifies a strategy to guide the delivery of service to a client for up to one year." (Pls.' Ex. 401 (DMR 11-3).)

which must be rewritten at least once annually. (Pls.' Ex. 401 (DMR 11); Tr. 2/26/99 at 66 (Ale).) DMR policy requires that the OPS process should focus, among other goals, on integration of residents into "normalized settings" and into "less restrictive program alternatives." (Pls.' Ex. 401 (DMR 11-4); Tr. 2/26/99 at 68 (Ale).) Under DMR regulations, IDTs are responsible for considering and, where appropriate, recommending community placement for individual class members. (See Tr. 2/26/99 at 75-78 (Ale).)

Prior to October of 1996, there was a process whereby community placement recommendations by IDTs were recorded and reported to the administration and, ultimately, to the DMR. (Tr. 4/5/99 at 112-13 (Howley); see also Tr. 2/26/99 at 122 (Ale, who oversaw IDTs until 1995 as Unit Director at STS, being impeached with a statement he made in his deposition that "there was an identification of need [for community placements] coming out of the individual OPSs" in previous years).) Statistics indicating the number of individuals who were interested in community placement were reported in the Monthly Management Reports issued by the central office of the DMR. (Tr. 4/5/99 at 112-13 (Howley); Tr. 9/13/99 at 103-5 (Hamad).) The October 1996, Monthly Management Report, for example, indicated that families and guardians of 40 individuals (5% of STS residents) were "very interested" in community placement, and families and guardians of 285 individuals

(59% of STS residents) were "willing to look" into the option. (Pls.' Ex. 390.)  Prior Monthly Management Reports contain similar figures.  (Id.)

Around 1996, however, the administration at STS stopped gathering information about class members' interest in community placement from IDTs.  Most OPS documents produced after 1996 do not indicate that IDTs ever made individualized community placement decisions or recommendations.  The "Future Plan" sections of these OPSs, which is where community placement recommendations would ordinarily be found, do not mention community placement.  (Tr. 2/26/99 at 98-101 (Ale); Tr. 2/11/99 at 147 (Gant); Tr. 3/29/99 at 78 (Ostrum Depo.)  Instead the majority of these documents make generic references to residents requiring a residential setting with 24-hour supervision, but they do not indicate whether these needs should be met in a community placement as opposed to a residence on the STS campus.  (Tr. 2/26/99 at 102-6 (Ale); Pls.' Ex. 411.)  In contrast, many pre-1995 OPSs specifically indicated that community placement was appropriate.  (Tr. 2/26/99 at 122-23 (Ale); Tr. 3/30/99 at 136 (Mulvey).)

The change in practice was intentional on the part of STS administrators.  Judith Mulvey, an assistant director at STS, admitted that, at some point in 1995 or 1996, the STS administration instructed IDTs to stop referring to placements "in the community" in OPSs. (Tr. 3/30/99 at 137; Pls.' Ex. 426 (Mulvey

Depo. 2/9/98 at 74-77).)  William Ale, who was Director of Family

Support Services at STS during this period, testified that, in his

view, IDTs were not required to determine what the most integrated

setting would be for a resident; instead, he directed them only to

consider whether the current placement at STS was appropriate.

(Tr. 2/26/99 at 102, 107-8.)  Kathryn Hanewicz, Director of Family

Support Services at STS, testified that she believes that IDTs do

not consider whether placement at STS or somewhere else would be

the most integrated setting for residents.  (Tr. 7/15/99 at 60-61).

The result of this change in policy was that there ceased to

be a formal mechanism for considering community placement for class

members.  Mulvey admitted that the generic statements appearing in

OPS Future Plans sections during this period were "not based on

formal assessment" of residents' needs.  (Tr. 3/30/99 at 147.)  A

number of case managers who worked at STS during this period

testified that they believed that it was not part of the OPS

process specifically to consider community placement.[19]  (See, e.g.,

---

[19]Examination of the OPSs produced during this period of time
indicates that a number of IDTs continued to discuss community
placement.  A substantial number of Future Plans sections state
that community placement would be appropriate or that residents
and their guardians would be willing to consider community
placement. (Pls.' Ex. 411.)  One explanation for this is that
case managers continued to include the phrase "in the community"
out of habit.  (Pls.' Ex. 426  (Mulvey Depo. 2/9/98 at 75).)
Whatever the reason, a large number of class members whose OPS
refer to community placement had not been placed at the time of
the trial.  (See Pls.' Reply to Defs.' Post-Trial Br. at 49-51
(listing 61 class members whose OPSs refer to community placement
as being appropriate).)

Tr. 3/29/99 at 22-23 (Katlamos Depo.), 31-32 (Morgan Depo.), 37 (McGuire Depo.), 60 (Palmer Depo.); see also Tr. 2/11/99 at 148 (Gant).)  One of the plaintiffs' experts, who had reviewed the practices and conditions at STS, reported that STS was unusual – even when compared to other institutions he had observed in Connecticut and elsewhere – in that its "clinical teams [were] instructed explicitly to obfuscate clients' appropriate level of care" in this manner.  (Pls.' Ex. 423B at 43-44 (Ray's Report).) It is apparent that during the fiscal years 1996, 1997 and 1998, for the majority of class members, the IDTs either failed to consider community placement or, in cases where community placement was considered, did not make a record of any recommendation or decision that was made regarding community placement.

The change in policy at STS followed changes in the state government and change in the leadership at DMR.  In 1993, then-Governor Wiecker announced his intention to close STS entirely, and Toni Richardson, who was then DMR Commissioner, began to develop a plan to close STS within five years.  (Tr. 9/27/99 at 47 (Moore).) The announcement of this plan angered many STS residents' families and guardians.  (Id. at 48.)  After Governor Rowland took office in 1995, the state changed course.  (Id.)  Defendant O'Meara, the incoming DMR Commissioner, emphasized improving services at STS and took the position that residents and their guardians should be able to choose whether or not to stay at the institution.  (Id.)

73

Instead of trying to close STS, O'Meara worked to get additional federal funding for STS by certifying as many beds as possible under the IFC/MR program.  (Id. at 52.)

Statistics relating to the number of class members whose families and guardians were willing to consider community placement are strikingly absent from Monthly Management Reports produced after November of 1996.  In stark contrast to the reports from October 1996 and before, the November 1996 report states that 730 residents "wish to stay" at STS and only 25 "wish to move."  (Pls. Ex. 309.)  STS Director Hamad testified that he and Commissioner O'Meara jointly agreed that STS should stop reporting numbers of class members who were "willing to look" but who had not reached a decision about community placement.  (Tr. 9/13/99 at 108-9.)  His explanation for the decision to exclude this category is puzzling. He testified that this data

> didn't really have any meaning to us anymore.  It is like
> asking people whether they would be interested in
> considering another job.  A lot of people would say yes
> to that, but that doesn't mean that they are out there
> looking for jobs.

(Tr. 9/13/99 at 108.)  This statement seems to reveal a belief that STS medical professionals should be absolved of responsibility to exercise their professional judgment about recommending placement in all cases except those in which a class member, a parent, or a guardian has explicitly asked for community placement.  Such an attitude is inconsistent with the integration mandate of the ADA

and § 504.

ii. <u>Availability of Placement Resources for Class Members</u>

Another major impediment to the exercise of professional judgment in considering community placement for class members during the period from approximately 1996 until the trial was the manner in which community placements were made available for residents of STS. STS officials testified that most placements out of the institution have been "opportune," that is they depend on an opening in an existing community residence somewhere in the state. (<u>See</u> Tr. 2/26/99 at 78, 84-85 (Ale).) Under the opportune placement process, the coordinator of a regional branch of the DMR notifies STS of a vacancy in his or her region. (Tr. 2/26/99 at 78-79 (Ale).) STS then sends a description of the placement opportunity to its case managers who, together with other IDT members, consider whether the placement is appropriate for any of the residents for whom the team is responsible. (Id.) If the IDT determines that placement is appropriate for an individual, and if the individual's guardian consents to placement, a referral is made. (Tr. 2/12/99 at 62 (Gant).)

Opportune placements become available relatively infrequently.[20] The availability of an opportune placement that is

_____

[20]The number of opportune placements available each year is unclear. Ale testified during his deposition that three or four opportune placements become available each year. (Tr. 2/26/99 at 79-80.) At trial, he testified that this number was too low but was unable to say how many opportune placements he believed were

suitable for a particular STS resident depends entirely on what openings occur in the regions. (Tr. 2/26/99 at 78-79 (Ale).) STS residents must compete with other disabled individuals in Connecticut for these openings. (Id.) Furthermore, because STS residents already have a place to live, they are not considered to be a high priority for opportune placements. (Tr. 9/27/99 at 73 (Moore); see also Pls.' Ex. 423B at 44 (Ray's Report) (reporting that senior staff at STS believe that class members are "discriminated against in their opportunities for community placement").)

The resulting scarcity of opportune placement for class members is highly problematic because it further restricts opportunities for professional judgment to be exercised. Ale testified that case managers and IDTs "are not supposed to make a judgment" about community placement and are only responsible for referring a resident to a community placement "if an opportunity becomes available." (Tr. 2/26/99 at 90.) Dr. Sue Gant, one of the plaintiffs' experts, reported that she had learned that case managers did not make referrals for community placement because there were insufficient resources with which to place class members. (Pls.' Ex. 423C at 36.) Gant estimated that approximately 650 STS residents have never had the benefit of a referral for a community placement. (Tr. 2/12/99 at 58.) This

_____

available each year. (Id.)

practice violates DMR policy, which requires that the OPS "should be built around the individual needs of each client regardless of the availability of resources."  (See Pls.' Ex. 401 (DMR 11-4).) Kevin Walsh, one of the defendants' experts, testified that he believes that it is improper for an institution to restrict IDTs from considering community placement and that IDTs should be allowed to "do that without consideration of availability of resources." (Tr. 7/21/99 at 136-38.)

Even in cases in which STS determines that placement is appropriate, a resident who is referred for an opportune placement may be rejected by the regional director, who will make the ultimate determination of whether to accept a resident who has been referred by his or her IDT.  (Tr. 2/26/99 at 79 (Ale).)  As a result, many referrals by STS have not resulted in a placement. (Tr. 2/11/99 at 152 (Gant).)  Furthermore, while it is possible to modify opportune placements to some extent in order to accommodate the needs of a resident, it is also the case that an opportune placement may simply not be appropriate for a class member who has been referred for placement. (Tr. 9/27/99 at 73-74 (Moore).)  Some class members who have requested placement in the community have been referred for placement a number of times but have been rejected by the regions on each occasion.  (Tr. 2/26/99 at 98 (Ale); Pls.' Ex. 340.)  According to Gant's review of the 108 STS residents referred for placement from 1994 to 1998, only 66 were

successfully placed.  (Tr. 2/12/99 at 62 (Gant).)

Another major weakness of the opportune placement process is that STS has no control over what community placement resources become available through opportune referrals.  STS and DMR therefore cannot systematically develop resources appropriate to STS residents' placement needs.  (Pls.' Ex. 423C at 33 (Gant's Report); Tr. 2/26/99 at 23-24 (Ale); see also id. at 89 (Ale) (testifying that there should be "some process to create resources in the regions to accommodate people at [STS]"); see also Tr. 3/29/99 at 59 (Palmer Depo.) (testifying that case managers at STS cannot do anything to ensure that there are community placement resources for class members who wish to leave STS).)

Thus, the opportune placement system severely limits the exercise of professional judgment with regard to community placements, and, even in the few cases in which STS does exercise professional judgment, such judgment may be thwarted when a class member is rejected by a regional director.

In addition to opportune placement, there also exists a procedure through which DMR may develop community placements for particular STS residents.  When a resident or his or her guardian indicates a preference for community placement, the DMR Commissioner is able to request funding from the legislature for an appropriate placement for the subsequent fiscal year.  (Tr. 7/15/99 at 34-35 (Hanewicz); Tr. 9/13/99 at 133 (Hamad); Tr. 10/20/99 at 62

78

(Dignoti).)  A limited number of STS residents were placed in the community through this process prior to 1997.  (See Tr. 2/4/99 at 76; Tr. 9/27/99 (Moore) (describing the appropriation of funds for community placement of STS residents as a "rare occurrence").)  However, the Commissioner of DMR requested no additional funding for placement for class members for the fiscal years 1998 and 1999 (Tr. 10/20/99 at 63 (Dignoti).  Instead, Commissioner O'Meara told a legislative appropriations committee that no funding for additional community placement for STS residents was needed because he could meet the placement needs of the few individuals who wanted to leave STS through opportune placements.  (Tr. 10/20/99 at 63 (Dignoti).)

The Commissioner requested funding for community placement for a total of 14 class members for the fiscal year 2000.  (Tr. 2/26/99 at 86 (Ale).)  As noted above, at this point there was no process in place to gather data on IDTs' recommendations for community placement from class members' OPSs.  Instead, the Commissioner and the STS administration based their representations to the legislature on a one-time survey conducted in 1996 (the "Family Survey") of families and guardians of class members.  (See Pls.' Ex. 426 (O'Meara Depo. 11/17/97 at 109); Tr. 2/26/99 at 85-86 (Ale).)  As discussed below, the Family Survey was deeply flawed and should not have been relied on in this manner.

iii. Reliance on the 1996 Family Survey and the Wish to Leave List

The Family Survey consisted of a one-page questionnaire and cover letter that was mailed to families and guardians of STS residents in May of 1996. (Pls.' Ex. 370.) The cover letter informed guardians and families that the purpose of the mailing was for DMR to solicit their "input regarding living arrangements for individuals living at STS." (Id.) The questionnaire contained three questions. Question 1A asked "Would you/your relatives like to remain at STS?" and required an answer of either "Yes" or "No." Question 1B elicited indications of respondents' interest in various living arrangements for their wards; this question asked respondents to indicate, on a scale of one to five, their interest in placements at a "DMR Campus/Regional Center," at a "Community Living Arrangement or Group Home," at a "Supported Living" arrangement, and at a "Community Training Home." (Id.) The survey provided brief, one-sentence descriptions of each of these kinds of living arrangements. (Id.) The survey also provided respondents with an opportunity to indicate that they would like additional information about any of these options, or that they were interested in taking advantage of any of these options immediately, or that they would be willing to consider any of these options in the future. (Id.) The third question, on the back of the questionnaire, inquired after respondents' "overall" interest in "community placement;" respondents were given the opportunity to indicate that they were "very interested," "willing to look and

consider," or "not interested."  (Id.)

Seven hundred and forty-one, or 97% of the parents and guardians who responded to the survey, answered "Yes" to Question 1A, indicating that they would like their wards to "remain at STS." (Pls.' Ex. 371.)  The families or guardians of only 28 STS residents answered "No" to this question.  (Id.)  The defendants interpreted the responses to the first question to mean that guardians overwhelmingly opposed community placement.  The DMR Commissioner seems to have relied on these results when he took the position before the legislature that no funding was needed for community placement for STS residents for a two-year period. (See Tr. 9/13/99 at 79-80 (Hamad).) The survey results for Question 1A are suspiciously similar to the figures purporting to reflect interest in community placement in the November 1996 Monthly Management Report, the first such report to eliminate reference to the category of guardians who were undecided but "willing to look" into community placement.[21]

Twenty-four of the 28 STS residents who answered Question 1A

_____

[21]Hamad denied that the Family Survey was used to "capture people's interests in looking at community placement."  (Tr. 9/13/99 at 109.)  However, neither Hamad nor the defendants have suggested an alternative source for the statistics in the Monthly Management Reports for November 1996 and later.  Furthermore, Moore, who was the STS assistant directly responsible for community placement from 1995 to 1998, testified that the Family Survey was the "only formal tool [he] had" to determine how many STS residents were interested in community placement.  (Tr. 9/27/99 at 128-29.)

in the negative were placed on a so-called "Wish to Leave List," and placements were actively sought for these individuals (Tr. 2/26/99 at 15-17 (Ale).) The defendants considered the class members on the Wish to Leave List to be priorities so that they would be referred for opportune placements ahead of other residents. (Tr. 2/26/99 at 81-83, 85-86 (Ale); Tr. 2/11/99 at151-52 (Gant).) The 14 community placements for which the Commissioner requested funding for the fiscal year 2000 included placements for the 10 class members remaining on this list at that point.[22] (Tr. 2/26/99 at 17, 85-86 (Ale); Tr. 9/27/99 at 97 (Moore); Pls.' Ex. 371.) Moore testified that after the Family Survey, neither case managers nor IDTs had any "direct input" into the number of community placements for which funding was requested from the legislature. (Tr. 9/27/99 at 129-30.) It is therefore clear that O'Meara's recommendation to the legislature had very little to do with the exercise of professional judgment.

The Family Survey, and Question 1A in particular, was not a reliable indicator of whether parents and guardians would consent to community placement.[23] The responses to Question 1B demonstrate

_____

[22]Ale testified that the remaining four placements were to be allocated to other class members according to demand. (Tr. 2/26/99 at 85-86.)

[23]The defendants continued to rely on the responses to Question 1A well into the trial. The report submitted by the defendants' expert Kevin Walsh relies in part on the fact that 97% of the survey's respondents answered "Yes" to Question 1A to demonstrate that class members, families, and guardians were

that families and guardians were considerably more willing to consider community placement than was suggested by the responses to Question 1A and by the statistics subsequently reported in the November 1996 Monthly Management Report. For example, 108 respondents indicated that they were either "very interested" or "somewhat interested" in a "Community Living Arrangement or Group Home." (Pls.' Ex. 371.) An additional 72 respondents were "not sure" about this category. (Id.) Similarly, responses to the third question on the questionnaire indicate that at least 70 respondents were either "very interested" in community placement or were "willing to look."[24] (Pls.' Ex. 383A.) That the statistics reported by the DMR did not paint a complete picture of how families and guardians felt about community placement should have been obvious to the defendants from a comparison of the responses to Question 1A with the figures reported in the pre-November 1996 Monthly Management Reports. The defendants knew that the results of Question 1A did not reflect guardians' interest in community placement. Dr. Hamad himself testified that he believes that the guardians of "most everyone," including the STS Foundation, would be "absolutely interested" in considering community placement for

satisfied with placement at STS. (Defs' Ex. 13B at 50.)

[24]A very large number of the completed surveys show that respondents originally indicated that they were "willing to look" but that these responses were crossed off and changed to "not interested." (Pls. Ex. 383A.) The court is unaware of any explanation for this surprisingly large number of changes.

their wards.  (Tr. 9/13/99 at 113-14.)

The Family Survey itself was misleading.  The cover letter explained that families and guardians could "change [their] mind at any time."  (Pls.' Ex. 371.)  The letter did not say that the survey presented a final opportunity to consent or withhold consent to community placement.  The letter also explained that, if parents and guardians were interested in community placement, STS "would work closely with the Regions to identify and take advantage of any available opportunities or possibly to initiate development of a particular option."  (Pls.' Ex. 370)  This statement suggests – perhaps accurately – that community placement would take place mainly through the opportune placement process and that any placement would depend on coordination with the regions.  Families and guardians who were informed that placements would be developed specifically for their wards might have been more willing to express an interest in community placement.

Apart from the one-sentence descriptions, neither the survey nor the cover letter gave much sense of what placement options were available.  This might have encouraged respondents to "play it safe" by indicating that they preferred their wards to remain at STS, the option with which they were most familiar.  (Tr. 4/7/99 at 186 (Conroy).)  Expert testimony established that efforts to educate guardians about community placement are often successful in changing their attitudes.  (Tr. 2/11/99 at 134 (Gant); id. at 125

(Gant) (explaining that guardians of institutionalized wards are generally more likely to favor community placement when faced with concrete options for placement than when considering the abstract possibility that their ward could live in a more integrated setting).)  James Conroy, one of the plaintiffs' experts, who has experience in conducting studies of deinstitutionalization, found the Family Survey to be so flawed in this respect that he was amazed that as many as 24 guardians and family members had the "courage" to answer "No" to the first question.  (Pls.' Ex 423H at 10-11 (Conroy's Rebuttal Report).)[25]

The Family Survey was not a substitute for the individualized consideration of community placement that should have taken place with mental health professionals, class members, families, and guardians at the IDT level.  The defendants' reliance on the Family Survey, together with the limits on availability of placements

---

[25]The 1996 Family Survey may also have been tainted by its similarity and temporal proximity to a 1993 survey conducted by the Home and School Association ("HSA"), after then-Governor Wiecker announced his intention to close STS entirely.  (See Tr. 9/27/99 at 47 (Moore); Tr. 3/2/99 at 101 (Bondy).)  The HSA, an independent organization, was opposed to the closure of STS, and the 1993 survey was intended to demonstrate that guardians were also opposed to the idea.  The question posed in the 1993 survey – "I or we would like our STS relatives to remain at Southbury Training School" – was almost identical to Question 1A from the Family Survey.  (Tr. 3/2/99 at 109 (Bondy).)  The responses to this question were almost identical as well: 95% of respondents to the 1993 survey answered "Yes."  (Id.)  It is therefore unclear whether families and guardians would have understood Question 1A as referring to community placement, as opposed to respondents' general level of satisfaction with STS, at all.

imposed by the opportune placement procedure and the failure of IDTs to systematically consider integrated settings for class members, effectively precluded the exercise of professional judgment in determining the appropriateness of community placement for most class members.

The defendants' reliance on the responses to Question 1A of the Family Survey is particularly troubling with respect to the approximately 170 class members who are wards of the Southbury Training School Foundation ("STS Foundation"). The STS Foundation indicated on the Family Survey that it wished all of its wards to remain at STS. (Tr. 3/2/99 at 102 (Bondy).) The evidence reveals that Anne Rotzal of the STS Foundation filled out Family Survey questionnaires for all of the organizations's wards without making any kind of individualized determination about whether community preference was desirable. (See id. at 111 (Bondy) ("[M]y understanding is that [Rotzal's] reasoning went like this, I know what's at Southbury, and I don't know what the alternative is, so I'll vote for what I know.").)

The STS Foundation has in the past been "unenthusiastic" about community placement. (See Tr. 3/2/99 at 85-86, 117 (Bondy).) The plaintiffs admitted into evidence a series of letters from 1994 and 1995 in which Dr. Howley, who was then Director of STS, attempted to address the STS Foundation's unwillingness to "seriously consider" community placements that had been recommended for

86

particular STS Foundation wards by case managers. (Pls.' Exs. 141-151; Tr. 3/2/99 at 53-58 (Bondy).) At some point the STS Foundation entered into a compromise agreement under which IDTs would cease to mention community placement in OPSs for STS Foundation wards. (Tr. 3/2/99 at 39-41 (Bondy); Tr. 4/5/99 at 98-100 (Howley).) According to Philip Bondy, Chairman of the Guardianship Committee of the STS Foundation, the organization later began to take a more favorable view of community placement and developed various lists of wards for whom the Foundation believed that community placement was appropriate. (Id. at 78-79; see also Pls.' Ex. 141).) However, there is no evidence that the Foundation ever passed this information on to STS for inclusion in the Wish to Leave List. Nor are these lists reflected in the STS Foundation's responses to the Family Survey. (Tr. 3/2/99 at 124 (Bondy).)

The defendants' reliance on the Family Survey as a substitute for gathering information about community placement recommendations from IDT meetings prevented professionals from exercising their judgment about community placement recommendations and deprived class members of the opportunity to be placed in more integrated settings. As a result, community placement of class members during the period from approximately 1996 until the time of the trial was clearly not the result of long-term planning based on a careful evaluation of class members' needs. However, the court does not

mean to suggest that the defendants are required to ignore decisions made by guardians. Ninety-seven percent of class members live under some form of guardianship; of these, 67% have plenary guardians and 33% live under a more limited form of guardianship. (Tr. 6/2/99 at 104 (Cole).) Plenary guardians are "the primary decision maker with respect to programs needed by [their wards] and policies and practices affecting the well-being of [their wards]." Conn. Gen. Stat. § 45a-677(i). Limited guardians are granted a similar decision-making power "with respect to such duties assigned to the limited guardian by the court." Id.

Under the ADA, the defendants are under no obligation to refer class members for community placement if class members wish not to be placed in the community. When a court has found that an individual is unable to make "informed decisions about matters related to his care" and appoints a guardian, see Conn. Gen. Stat. § 45a-676(a-b), then responsibility for making this kind of decision necessarily falls to the guardian, not the individual. It is therefore appropriate that STS officials will not refer a resident for placement in the community without the consent of a guardian.[26] (See, e.g., Tr. 9/13/99 at 115-17 (Hamad); Tr. 2/26/99

---

[26]The Family Survey responses include responses from limited guardians who might not have the authority to withhold their consent to community placement. STS treated guardians' responses in the same manner without distinguishing between different kinds of guardianship and without determining whether limited guardians had the power to withhold this consent. (Tr. 7/15/99 at 69-72 (Hanewicz).) This is an additional reason that the defendants

at 17-19, 67 (Ale); Tr. 3/29/99 at 68 (Martin Depo.); Tr. 3/25/99 at 52 (Greusel).)

The plaintiffs dispute the notion that guardians have the power to withhold consent to community placement. They argue that "the right to refuse appropriate community alternatives . . . rests with the class member not his guardian." (Pls.' Post-Trial Br. at 144; see also id. at 118-19; Pls.' Proposed Conclusions of Law at 23) The plaintiffs do not address the Connecticut guardianship statutes, which give guardians the power to refuse to consent to community placement. Instead, they argue that, as a matter of due process, a state cannot give guardians a "veto" power over community placement decisions affecting their wards.

The cases cited by the plaintiffs in support of this argument are inapposite. The majority of the cases they cite involve the rights of individuals with mental retardation and mental illness to procedural safeguards at civil commitment proceedings. E.g., Parham v. J.R., 442 U.S. 584 (1979); Sec'y of Pub. Welfare v. Institutionalized Juveniles, 442 U.S. 640, (1979); Heller v. Doe, 509 U.S. 312 (1993); Doe v. Austin, 848 F.2d 1386 (6th Cir. 1988). The plaintiffs are correct that these cases sometimes recognize that the interests of guardians and wards may diverge. See, e.g., Parham, 442 U.S. at 608 (holding that a child whose parents sought

---

should not have relied on the responses to the Family Survey in determining which class members would be considered for community placement.

to have him committed to a state facility had a due process right to an inquiry by a "neutral fact-finder," such as a doctor, though he did not have a right to a full judicial commitment proceeding). However, the context of civil commitment should be distinguished from community placement. The Supreme Court has recognized that involuntary commitment to an institution is "a massive curtailment of liberty" that requires due process protections, including the right to a hearing. See <u>Vitek v. Jones</u>, 445 U.S. 480, 491-492 (1980). It is for this reason that, for example, the commitment of an individual with mental retardation by his or her guardian is considered involuntary and requires a hearing. See <u>Austin</u>, 848 F.2d at 1392. In contrast, community placement decisions implicate due process in a much less drastic manner; there is no constitutional right to placement in the community but, instead, only a constitutional right to have professionals exercise their judgment as they must in any decision regarding treatment, programming or the use of restraints at a state institution. <u>Society for Good Will</u>, 737 F.2d at 1249. Cases involving the rights of guardians and wards at civil commitment proceedings are therefore inapplicable here.

The plaintiffs' reference to <u>Planned Parenthood v. Danforth</u>, 428 U.S. 52 (1976), a case in which the Supreme Court struck down a parental consent requirement for abortions performed on minors, is similarly unpersuasive. In holding that a requirement that all

minors obtain consent before undergoing an abortion was overbroad, the Court in <u>Danforth</u> "emphasize[d] that [its] holding [did] . . . not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy." <u>Id.</u> at 75 (citing <u>Bellotti v. Baird</u>, 428 U.S. 132 (1976)). Even if this case were applicable in the present context,[27] its reasoning is consistent with the kind of decisions that are made by guardians about community placement. Under the Connecticut guardianship statute, guardians are only appointed for individuals who are determined by a court to be incapable of making informed decisions. Wards therefore fall into an exception that is analogous to the exception recognized in <u>Danforth</u>. Another case cited by the plaintiffs, <u>Milonas v. Williams</u>, 691 F.2d 931, 943 (10th Cir. 1982), which involved parental consent to certain disciplinary practices at a school for youths with behavioral problems, relied on this same reasoning from <u>Danforth</u> and <u>Bellotti</u> and is therefore unhelpful to the plaintiffs.

In <u>Thomas S. v. Morrow</u>, 601 F. Supp. 1055, 1060-61 (D.C.N.C. 1984), the issue of guardians' control over community placement decisions was raised, but the court declined to rule on the issue, and, therefore, the plaintiffs' reliance on the case is misplaced.

---

[27]<u>Bellotti</u>, 428 U.S. at 148-50 held that consent procedure for abortions were distinguishable from consent procedures for other kinds of medical procedures. It would therefore most likely be incorrect to apply these cases to community placement decisions.

Id.  The issue of a so-called "guardian veto" did not arise in
Clark v. Cohen, 613 F. Supp. 684 (D.C. Pa. 1985), and so the
plaintiffs' citation to that case is mysterious.  The plaintiffs
also refer to Richard S. v. Dep't of Developmental Servs., No. CV
97-219 at *18 (C.D. Ca. 2000), an unpublished opinion in which the
court stated that it was "not appropriate" to give "parents,
conservators, and other legal representatives veto authority to
overrule . . . residents' preferences and/or best interests."  The
court's reasoning seems to have been based on interpretations of
California law rather than the United States Constitution.  This
court is not persuaded that the quotation is a correct statement of
the law applicable to this case.  Furthermore, it seems obvious
that guardians may, in fact, override a ward's preferences in many
situations; they may do so, for example, when a ward's preference
is for something that is not in his or her best interest.

However, the power of guardians to make decisions affecting
their wards' treatment does not excuse the defendants' failure to
make community placement available or their failure to exercise
professional judgment in the overwhelming majority of cases.
Guardianship does not completely divest a mentally retarded
individual of the right to participate in decisions.  In making
decisions affecting the "well-being" of a ward, a guardian "must
consult with the ward and appropriate members of the ward's family,
where possible."  Conn. Gen. Stat. § 45a-677(i).  See also Oller v.

Oller-Chiang, 230 Conn. 828, 848-853 (1994) (reviewing scholarship about the importance of including wards in the decision-making process and holding that a court must consider a ward's preference in selecting a guardian). Furthermore, a guardian should not be allowed simply to ignore the advice of medical professionals. See Conn. Gen. Stat. § 45a-678 (providing for the appointment of a new guardian where a court finds it to be in the best interest of the ward).

In addition, professional standards require that the opinion of an individual with mental retardation be taken into account in making community placement decisions. (Tr. 2/9/99 at 157 (Gant); Tr. 4/7/99 at 192 (Conroy); Pls.' Ex. 423H (Conroy's Rebuttal Report) at 11.) Conroy testified that many mentally disabled individuals like the class members are capable of indicating that they have an opinion about where they wish to live. (Tr. 4/7/99 at 192.) Gant estimated, based on her study of the institution, that between 80 and 100 class members were interested in community placement. (Tr. 2/11/99 at 172.) Ale admitted that he knew of class members who had expressed a desire to be placed in the community and who had not been placed because their guardians withheld consent (Tr. 2/26/99 at 18-19.) The defendants' procedures encouraged guardians to make a final decision about community placement in their responses to the Family Survey before wards had an opportunity to be consulted.

When professional judgment indicates that a mentally retarded individual should be placed in the community, or when such an individual wishes to be placed in the community, it may be appropriate to challenge the decision of a guardian who refuses to consent to community placement. STS officials agree that it is appropriate to challenge a guardian who insists that his or her ward remain at STS even after professionals have determined that the ward's needs would be better met in the community. (See Tr. 9/13/99 at 116 (Hamad) ("[W]e would not place someone over the objection of the guardian unless we had an issue relative to meeting that person's needs."); Tr. 7/14/99 at 122-24 (Hanewicz); Tr. 3/29/99 at 70-71 (Martin Depo.); Tr. 6/1/99 at 93-94 (Foxx).)

DMR regulations allow the agency to transfer STS residents to other residential settings against the wishes of guardians. (See Pls.' Ex. 410 (DMR Administrative Directive 15) (providing for an administrative hearing at which DMR may show by clear and convincing evidence that transfer is in the best interests of the resident and that the new placement "provides a greater opportunity for personal development" than the resident's current placement).) In some cases, it may also be appropriate to petition a court to remove a guardian who refuses to consent to community placement. See Conn. Gen. Stat. 45a-678. The problem with the defendants' policy is that, in cases in which the guardian's response to the Family Survey had "vetoed" community placement, the opportunity to

challenge a guardian's refusal to consent to community placement would never arise because IDTs were prevented from determining whether community placement was appropriate.

The ADA's preference for integrated settings is not consistent with a procedure in which remaining at STS is the default option for residents. The defendants cannot establish compliance with the integration mandate by showing that class members never requested community placement. The Supreme Court's reasoning in Olmstead makes it clear that a state must do more than wait until the residents of its facilities have affirmatively asked to be placed in the state's integrated residential settings; the state's failing in Olmstead was that it did not place the residents even after its "own professionals had determined that community-based treatment would be appropriate for [the two residents] and neither woman opposed such treatment." Olmstead, 527 U.S. at 603. The regulations do not conceive of a resident's option to decline community placement as a right that is to be exercised before any professional judgment has been brought to bear. Rather, the regulations state that "persons with disabilities must be provided the option of declining to accept a particular accommodation." 28 C.F.R. pt. 35, App. A, p. 350 (1998) (emphasis added); quoted in Olmstead, 527 U.S. at 603.

An opportunity to discuss the possibility of community placement with guardians could make a substantial difference in the

number of referrals for placement. Ale agreed that "the availability of resources is extraordinarily important in working with parents and educating them about the benefits of community placement." (Tr. 2/26/99 at 94; see also Tr. 4/6/99 at 95-96 (Moore). Richard Foxx, one of the defendants' experts, testified that he believes the role of the IDT is to make recommendations to which guardians should listen before making a decision about community placement or any other aspect of a ward's treatment. (Tr. 6/1/99 at 93-94.) By concluding from the results of the Family Survey that there is no demand for community placements, the defendants may have prevented guardians and families from making informed choices.

There is a significant difference between, on one hand, a procedure in which a guardian's response to a somewhat misleading question on a survey determines whether or not the ward will ever be considered for community placement and, on the other hand, a process in which guardians are allowed to consider community placement during an IDT meeting at which the guardian has an opportunity to consult with professionals and with the ward. The former procedure deprives class members of their constitutional right to the exercise of professional judgment and undermines the integration mandate of the ADA and Section 504. The latter procedure appears to the court to be consistent with these laws and does not interfere with a guardian's right to withhold consent.

The evidence shows that the defendants have not reached a satisfactory balance between respecting the rights of guardians to withhold consent for community placement and the requirements that state officials exercise professional judgment in considering community placement and that they give effect to the integration mandate of the ADA and Section 504.[28]  The defendants should not have waited until a resident or guardian affirmatively asked for community placement.  They should have given class members and their guardians an opportunity to consider community placement before declining the option.  Instead, the defendants failed to discuss community placement at IDT meetings.  They failed to gather information about the number of class members for whom community placement was appropriate.  Having failed to learn how many class members could or should be placed in the community, the defendants failed to develop resources for placing class members.  Instead, the defendant Commissioner of DMR told the legislature that there

---

[28]Another example of the defendants' deference to guardians is Mulvey's explanation that IDTs were instructed to cease mentioning community placement on OPSs because the STS administrations wanted to avoid conflicts between guardians who opposed community placement and members of the IDTs who recommended community placement.  (Pls.' Ex. 426 (Mulvey 2/9/98 Depo. at 76); Tr. 3/30/99 at 136-37 (Mulvey).)  This explanation is undermined by the fact that the Monthly Management Reports issued before November 1996 indicated that there were some 285 class members whose families and guardians were relatively open-minded about community placement.  It is difficult to believe that these family members and guardians would find themselves in conflict with a case manager who inquired about their preference for community placement.  Mulvey's explanation also demonstrates an unwillingness to comply with the integration mandate.

was no demand for community placement.  Class members, or at least class members who were not included on the Wish to Leave List, were thus deprived of the right to have a professional determine whether it would be appropriate to place them in a more integrated setting.

iii. Community Placement Under EMPOWER

In May 1999, after the plaintiffs' case in chief was complete, DMR issued a document in which it set forth its policy on community placement for STS residents.  This document (Pls. Ex. 1132) was titled "Expanding Meaningful Placement Options With Equity and Respect: Refining and Enhancing the 'Choice' Model for Residential Placement, Support, and Service Decision-Making for STS Residents" and is commonly referred to as "EMPOWER."  The EMPOWER policy applies solely to STS residents.  (Tr. 9/27/99 at 133 (Moore).) The timing of the issuance of this document suggests that the promulgation of the EMPOWER policy was at least in part a response to criticism of the community placement procedures at STS by the plaintiffs and Special Master Ferleger.  See Report to the Court No. 7: Community Placement: A Preliminary Study, U.S. v. Conn. (Feb. 23, 1999).  Moore admitted that the document was created in recognition of the fact that the Family Survey was three years old at that point.  (Tr. 9/27/99 at 182.)

EMPOWER is premised on a model of "choice;" the policy assumes that "[a]ny person with mental retardation . . . may be served in any setting – any site – as long as appropriate supports and

services are available." (Pls.' Ex 1132.) The defendants have indicated that, under the policy, limitations on resources will not restrict placement of class members in the community. (Tr. 9/27/99 at 74 (Moore); Tr. 10/21/99 at 42 (Sterns).) As part of the EMPOWER policy, the defendants have established a "community reserve fund" which is intended to function as a third way, in addition to opportune placement and appropriations from the legislature, to fund placements for STS residents. (Tr. 9/27/99 at 74-78 (Moore).

EMPOWER is intended to implement a "continuous assessment of choice" to determine class members and guardians' interest in community placement. Under the policy, each guardian is to receive a "Quarterly Assessment of Choice" form which asks, "Do you want the Department to actively pursue and plan an alternative placement for [the STS resident]?" (Pls.' Exs. 663, 1132.) Guardians may answer "Yes" or "No" to this question. (Pls' Ex. 1132.) This question must also be posed to guardians at each IDT meeting, and, if the guardian is not present at the meeting, the guardian can be contacted by telephone or mail. (Pls.' Ex. 663; Tr. 9/27/99 at 150, 176 (Moore).) The guardian may respond before, during or after the IDT meeting. (Tr. 7/15/99 at 50 (Hanewicz).) The guardian's response is then included in the resident's OPS. (Pls.' Ex. 663.)

EMPOWER requires IDTs to consider community placement only

when guardians answer 'Yes." (7/15/99 at 55-56 (Hanewicz); Tr. 9/27/99 at 141-42, 172-73 (Moore).) The policy states that "as a general rule, alternative residential placements, supports and services shall be actively pursued and planned when the resident or his or her guardian, as appropriate, chooses to pursue and plan such alternatives." (Pls.' Ex. 1132.) However, residents whose guardians have not answered "Yes" to the quarterly form may still be considered for opportune placements as they arise. (Tr. 7/15/99 at 55-56 (Hanewicz).) The purported reasoning behind a procedure in which consideration of community placement may only be initiated by a guardian's request is that IDTs should not "need to engage in an unnecessary assessment process to determine who may be 'eligible' or 'ready' for [community placement] because all STS residents are 'eligible' and 'ready.'" (Id.) The policy requires that STS attempt to override a guardian's choice only when the IDT finds that placement at STS is not meeting the resident's needs, or when there is a conflict between the guardian and the resident. (Id.; Pls' Ex. 663.) When STS recommends placement in either of these scenarios, a guardian may challenge the decision through an administrative process or in court under Conn. Gen. Stat. § 17a-210.[29] (Pls. Exs. 663, 1132.)

According to the compiled responses to Quarterly Assessment of

---

[29]Conn. Gen. Stat. § 17a-210 provides for procedures to challenge the decision by the DMR Commissioner to transfer an individual from one state facility to another.

Choice forms that were admitted into evidence at trial, 28 guardians indicated that they wished to actively pursue community placement. (Pls' Proposed Findings at 220.) It is therefore apparent that community placement is being considered for some additional class members than was the case under the old procedures. In many ways, EMPOWER appears to conform more closely with the requirements of the due process and the integration mandate than previous procedures. EMPOWER makes community placement resources more readily available, though as of the time of trial the usefulness of the Community Resources Fund had yet to be tested. The defendants have implemented a somewhat more reliable system for ascertaining guardians' choices regarding community placement. Because the process of assessing choice is intended to be continuous, class members are less likely to be totally deprived of the opportunity to have a professional exercise judgment about his or her possible placement in the community.[30]

The plaintiffs object to the EMPOWER policy because it allows IDTs to refrain from considering community placement for all class

_____

[30]The court notes that some class members seem again to have been arbitrarily deprived of this opportunity. Examination of the compiled Quarterly Assessment of Choice forms indicates that case managers sometimes completed the forms without consulting guardians. For example, the form for William B. indicates that DMR is not to actively pursue community placement even though the case manager explains that she was unable to reach William's guardian. (Pls' Ex. 1134; see also Quarterly Assessment of Choice forms for Wendy C. and Anthony D.) Case managers should not treat "No" as the default answer to the Quarterly Assessment of Choice.

members whose guardians do not answer "Yes" to the single question posed by the Quarterly Assessment form. (Pls.' Post-Trial Br. at 129-30.) As discussed above, the plaintiffs are incorrect insofar as they claim that allowing guardians to make choices about community placement always constitutes a denial of due process. Many of the responses to the Quarterly Assessment of Choice forms indicate that guardians are adamantly opposed to community placement and feel that their wards are happy and receive excellent care and programming at STS. (E.g., Pls.' Ex 1134 (Quarterly Assessment of Choice for Helen G.).) Assuming that a professional has considered community placement and has not determined that the guardian's perception is inaccurate, STS has no duty to attempt to override the guardian's decision in a case such as this.

However, the court is concerned, for example, about what happens after a guardian checks "No" on the form even though he or she is somewhat open to considering placement. Many guardians indicated on their Quarterly Assessment of Choice forms that they did not want to "actively" pursue community placement but also indicated in the "Comments" section of the form that they would consider community placement if an opportunity arose. (Pls.' Ex. 1134; see, e.g. Quarterly Assessment of Choice for Catherine A.) The plaintiffs claim that out of 693 completed forms there were 34 such responses. (Pls.' Proposed Findings at 513 ¶ 220.) There could well be additional guardians with similar feelings who failed

to note their willingness to consider community placement on the forms. The wards of these guardians should not be deprived of an opportunity for an IDT to consider whether community placement would be appropriate for them.

Furthermore, a number of responses also indicate that some guardians are not familiar with what resources would be available for their wards in a community placement. For example, the guardian for Thomas D. answered "No" to the Quarterly Assessment question but then indicated that she would consider a community placement if "it would have everything STS has, including 24 hour medical care." (Pls.' Ex. 1134.) Similarly, Sandra G.'s guardian answered "No" and indicated that "placement can only be allowed if it meets Sandra's specific need." (Id.) The guardian for Richard D. said that "there was no reason to develop another home" but that she would "consider alternatives if presented and they offer Richard an improvement from what he has now." (Id.) It is possible that guardians like these would consent to community placement should they be presented with a concrete opportunity. Furthermore, guardians can choose not to have IDTs consider community placement even without being present at the IDT meeting. As a result there is a danger that guardians who are not involved in their wards lives will select "No" on the Quarterly Assessment of Choice without seriously considering community placement, thus depriving their wards of the opportunity for professional judgment

to be exercised.[31]

As discussed above, a policy of failing to consider community placement unless a guardian affirmatively requests it violates the integration mandate. Such a procedure also prevents IDTs from exercising professional judgment in determining whether the class member could benefit from community placement. DMR policy, which requires that the OPS process focus on integrating residents into "normalized settings" and into "less restrictive program alternatives" (Pls.' Ex. 401 (DMR 11-4)), would suggest that the

---

[31]The court is particularly concerned about what information is available to guardians and families in light of some of the completed Quarterly Assessment of Choice forms contained in Plaintiffs' Exhibit 1132. Two of these forms are identical to the usual forms except that they contain an additional note that reads

> HOME & SCHOOL ASSOC. NOTE: This is the new form STS is asking guardians to sign – If you say yes to actively pursue alternative placement your name goes on a placement list. DMR sets aside money and a home is developed for the resident – But you don't know who the provider will be, <u>what supports are available or what services the person will receive.</u>

(Pls.' Ex. 1132 (Quarterly Assessments of Choice for Mary B. H and Alec M.W.).) This note would discourage many guardians from answering yes to the question on the form. Moore testified that the note was misleading and that he did not know how or why these forms were sent to guardians. (Tr. 9/27/99 at 177-81.) One possibility is that the Home and School Association mailed this version of the form to guardians and that the guardians for these two class members returned this version to STS instead of the official version. In any event, there is a grave danger that guardians who receive forms like this did not make an informed choice. The danger of uninformed choices would be diminished if IDTs had a practice of considering community placement in every case and, if appropriate, discussing options with guardians and their wards.

professionals on IDTs should raise the issue of community placement for all class members, and in particular for those class members whose guardians are undecided about the idea of placing their wards in the community. (See also Pls. Ex. 663 (letter of April 15, 1999) (explaining to guardians that community placement will be "formally discuss[ed] within the [IDT] process").) However, the EMPOWER policy allows IDTs to refrain from considering community placement for these class members. Thus, the court is unable to conclude that the EMPOWER policy satisfies Youngberg or the integration mandates of Title II and Section 504. The court sees no reason why STS professionals should not be required to consider the appropriateness of community placement in every case. See, e.g., Thomas S., 902 F.2d at 254 (approving of the actions of the district court in "set[ting] up a process in which the [community placement] needs of each class member will be evaluated by professionals on a case-by-case basis.") Once professional judgment has been exercised, residents and their guardians may choose to decline the option.

It is conceivable that opportune placements are now sufficiently numerous to allow IDTs to present concrete placement options for the consideration of guardians who are open to placement. Hanewicz testified that, as of July 15, 1999, five guardians who had checked "No" on the Quarterly Assessment of Choice were actively considering opportune community placements.

(Tr. 7/15/99 at 59.)  However, the court does not have sufficient information about how many placement opportunities are made available to residents whose guardians have answered "No" on the Quarterly Assessment of Choice.  The EMPOWER policy was new when evidence about it was presented, and, therefore, the court is not in a position to determine the extent to which it has corrected for the deficiencies in the old community placement procedures.

Finally, there is an additional reason to be concerned about whether the EMPOWER policy has cured all of the deficiencies in the community placement procedures at STS.  Administrators at STS who were responsible for creating and implementing EMPOWER testified that it is not a new policy but, rather, that it reflected polices and practices that had been in place at STS for years.  (Tr. 9/27/99 at 127 (Moore); Tr. 7/14/99 at 105-6 (Hanewicz); Tr. 7/15/99 at 39 (Hanewicz).)  Given that the old community placement procedures at STS were inadequate under both the constitution and the statutory integration mandates, it is hardly encouraging that STS officials believe that the situation has not changed.

The court cannot conclude that the defendants' community placement procedures have come into compliance with the law.

iv.  Discrimination on the Basis of Disability

The plaintiffs claim to have established that the defendants discriminated on the basis of disability by refusing to consider severely retarded class members for community placement.  (Pls.'

Post-Trial Brief at 137-39.)

In the fiscal year 1995-96, 78% percent of class members were either severely or profoundly retarded. (Pls.' Ex. 423C at 34 (Gant's Report).) In the same fiscal year, 65% percent of the placements made out of STS were of severely or profoundly retarded class members. (Id.) In the following fiscal year, 50% of the placements made were of severely or profoundly retarded class members. (Id.) The plaintiffs claim that these numbers show that STS placed class members with severe disabilities at disproportionately lower rates than class members with less severe disabilities. (Pls' Post-Trial Br. at 139) However, Gant based these calculations on a very small number of actual placements: according to her, in fiscal year 1995-96 only 18 STS residents were placed, and in fiscal year 1996-97 there were only 12 placements. (Pls.' Ex. 423C at 37.) The court cannot conclude, based on this small sample size, that defendants have discriminated on the basis of severity of disability.

The defendants have no obligation under the ADA to place severely disabled individuals at the same rates as they place less severely disabled individuals. The defendants are obligated only to consider severely disabled class members for placement, just as they do less severely disabled individuals, and cannot discriminate solely on the basis of severity of disability. See Messier, 1999 WL 20910 at * 10. The defendants did indeed consider severely and

107

profoundly retarded class members for community placement.  In
fact, the majority of the referrals for community placement have
been STS residents with severe disabilities.  (Tr. 2/12/99 at 71
(Gant).)  The evidence indicates that the defendants generally
failed to exercise professional judgment in considering community
placement for a large number of class members regardless of the
degree of their disability, but the plaintiffs have not established
that the defendants failed to *consider* more severely disabled class
members for community placement.

However, the plaintiffs have established that many severely
and profoundly retarded class members referred for placement were
not successfully placed in the community.  In the fiscal year 1995-
96, only 16% of the STS residents labeled severely retarded who
were referred for placement were successfully placed in the
community.  (Pls.' Ex. 423C at 36 (Gant's Report).)  In the same
fiscal year, only 36% of those labeled profoundly retarded and
referred for placement were successfully placed in the community.[32]
(Id.)

Gant concluded that the failure to place so many of the

---

[32]In their Post-Trial Brief , the plaintiffs confuse some of
the figures reported by Gant.  The plaintiffs claim, for example,
that in the fiscal year 1995-96 "only 16% of the class members
labeled severely retarded were *referred* and only 36% of those
labeled profound were *placed*."  (Pls.' Post-Trial Br. at 139
(emphasis added).)  The plaintiffs thus incorrectly suggest that
these numbers demonstrate a failure even to consider placing
severely retarded individuals in the community.

severely and profoundly retarded individuals who were referred was a result of a lack of available placement opportunities. (Pls.' Ex. 423C at 35-37.)  The difficulty in placing severely disabled individuals appears to have been the result of the "opportune" system of placement in conjunction with the failure on the part of the DMR to develop additional placement resources that were suitable for class members for whom placement is appropriate. (See Tr. 2/26/99 at 117-18 (Ale) (testifying that he found it difficult to place senior residents and residents with "psychosocial problems" because the resources needed to provide services to these residents in a community setting are not in place).) DMR failed in particular to provide placements for severely disabled class members.  For example, there was a shortage of placements for individuals with multiple handicaps, maladaptive behavior conditions, and other medical problems.  (Tr. 2/30/99 at 134 (Mulvey); Tr. 2/11/99 at 131-32 (Gant); Tr. 3/2/99 at 55 (Bondy).) The defendants' failure to provide resources for class members with more severe handicaps constitutes discrimination within the meaning of the ADA and Section 504.  Jackson v. Fort Stanton Hosp. and Training Sch., 757 F. Supp. 1243, 1299 (D.N.M. 1990) (finding discrimination on the basis of severity of disability where "severely handicapped residents are precluded from living in community settings because the programs lack amenities, that could reasonably be furnished without substantial program changes,

necessary to accommodate the needs of the severely handicapped"),
rev'd on other grounds, 964 F.2d 980 (10th Cir. 1992).

The defendants have attempted to correct for the inadequate
community placement resources.  Under the EMPOWER policy, the
defendants have committed themselves to making resources available
for class members who wish to be placed in more integrated
settings.  However, the EMPOWER policy had only recently been
implemented at the close of the trial in this case, and the court
is therefore unable to determine whether or not the defendants have
ceased to discriminate on the basis of severity of disability.

v.    Fundamental Alteration Defense

The defendants argue that the remedy sought by the plaintiffs
would constitute a fundamental alteration of Connecticut's programs
for the mentally disabled.  (Def.'s Post-Trial Br. at 24.)
Specifically, the defendants claim that the remedy sought would
entail a "massive movement of money from STS to community programs"
and would require a "gigantic appropriation of funds."  (Id. at 24-
25.)

The defendants' characterization of the remedy sought by the
plaintiffs is misleading since what is at stake in this case is
somewhat limited.  The court has previously stated that, to the
extent that the plaintiffs seek "to end all admissions to STS,
transfer all residents to community settings or otherwise shut down
STS, this court has effectively narrowed the complaint, as mandated

110

by prevailing precedent, to exclude any such relief." (Ruling on Motion to Intervene (March 7, 1996) at 4 (Doc. No. 78.) Based on this narrow reading of the relief sought, it is unlikely that "massive" or "gigantic" changes will be required as a result of ordering the defendants to exercise professional judgment in considering whether class members are qualified for community placement and ordering them to make reasonable modifications to Connecticut's programs in order to make placement possible in cases where it is appropriate.

Furthermore, the evidence does not support the defendants' fundamental alteration defense. The defendants have not presented evidence that allocating the resources needed to place qualified class members in the community would result in a fundamental alteration. To the contrary, the EMPOWER document issued by the defendant DMR, claims that "Connecticut has developed one of the finest community service systems in the nation." (Pls Ex. 1132.) In the document, the DMR claims that the community placement program in Connecticut is continuing to grow. (Id.) Even when the document was issued in May 1999, "[r]esidential placement, support and services [were] available in an array of program models" and community placement options were already "many, varied and real." (Id.) The DMR's fundamental alteration claim in this case is entirely inconsistent with its public commitment to further enhancing a system of community placement programming which, it

claims, was already robust in early 1999.

The defendants argue that they cannot, under the ADA, be required to create entirely new programs for the disabled. (See Defs.' Post-Trial Br. 26 (quoting Rodriguez v. City of New York, 197 F.3d 611, 619 (2d Cir. 1999).) The defendants do not explain, however, why fulfilling their obligation under the ADA to properly assess whether class members should be placed in the community would necessitate the creation of new programs. It is clear from the evidence that, where appropriate, community placement could be achieved through existing programs. Placing class members in the community might result in some additional expense to the state, but, as discussed above, courts have held that minimal additional expense incurred as a result of a defendant's compliance with the integration mandate does not, alone, support a fundamental alteration defense. The defendants therefore have not met their burden of establishing this affirmative defense.

## CONCLUSION AND ORDER

The plaintiffs' request for injunctive relief to remedy alleged constitutional and statutory violations relating to conditions, services and programs at STS is moot as resolved by the actions taken in United States v. Connecticut, No. 3:86-cv-252 (D. Conn. 1986).

The plaintiffs have established that the defendants, as of the time of the trial in this case, had failed adequately to provide

112

for the evaluation of all class members for community placement and had failed to place in the community class members for whom such placement was found to be appropriate by the defendants' treatment professionals and who had consented to or requested such placement either through their guardians or, where appropriate, themselves.

Accordingly, to ensure the fashioning of an appropriate remedy for addressing the deficiencies found, the court will conduct a status conference on June 13, 2008, at 11 a.m., to establish a schedule for a hearing on the issue of remedy at which hearing the defendants shall present data as to placements made by them since the date of the trial and procedures to be implemented to assure placements are made in the future where appropriate. Participation in the conference may be by telephone if requested.

SO ORDERED.

_____/s/_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 4th day of June, 2008.